ADAM L. MILLS *et al.*, appellants, *v.* THE COUNTY OF ST. CLAIR *et al.*, appellees.

| 7 | 197 |
| 166 | 178 |
| 2g | 197 |
| 104a | 6531 |

*Appeal from St. Clair.*

The legislatures of the several States possess the power, within their limits, to establish and regulate ferries, and that power is sufficiently extensive to authorize a grant for the construction of a ferry from the Illinois shore, on the waters of the Mississippi, in the manner prescribed by the Act of March 2, 1819. A privilege thus conferred in no way conflicts with the provisions of any treaties made by the United States with foreign powers, or with any Act or Acts of Congress relative to the free navigation of these waters.

A ferry franchise is neither more nor less than a right conferred to land at a particular point, and receive toll for the transportation of passengers and property from that point across a stream. The exercise of such a franchise divests no right or privilege, which any citizen theretofore enjoyed freely and uninterruptedly to navigate the river. This right of free navigation can, by no manner of means, be construed as conferring upon the citizens the right to appropriate the banks, or landings of this river to themselves, or to receive toll for transporting passengers and property from point to point across the same.

The grant of a ferry franchise by the legislature of a State, unless limited by some general law, or some restrictive provision in the grant itself, is necessarily exclusive to the extent of the privilege thus conferred. When a grant has once been made by legislative authority, to the extent of the rights conferred, the power which made it is expended, and it cannot be taken back or transferred to another, until the public interests and welfare shall demand its resumption, and provision shall have been made for just compensation to the owner in the manner required by law.

Under the Acts of March 2, 1819, and February 6, 1821, the grant to Samuel Wiggins was essentially a contract between him and the State. By the terms of it, on his part, he is bound to run the ferry to afford, at all times, a safe and speedy passage to travelers and their property across the river; to keep for this purpose a supply of boats and hands, and to propel such boats in

the manner directed by the Act; and, on its part, the State contracts that he may run the ferry from lands which may belong to him near the town of Illinois. The obligations imposed by the Act, and the power and ability to perform them, must, of necessity, be mutual.

The rule of construction of private grants, if the meaning of the words be doubtful, is, that they shall be taken most strongly against the grantor. An opposite rule prevails in cases of grants made by a sovereign power. When there is doubt, the construction is made most favorably for the sovereign, and most strongly against the grantee. But this rule holds good only in cases of real doubt.

If a grant admits of two interpretations, one of which is more extended, and the other more restricted, so that a choice is fairly open, and either may be adopted without any violation of the apparent objects of the grant; if, in such case, one interpretation would render the grant entirely inoperative and worthless, and the other would give it force and effect, the latter, if within the reasonable meaning of the terms employed, should be adopted. But public grants should not be extended by implication in favor of the grantee beyond the natural and obvious meaning of the words employed, even if by such construction the object of the grant is utterly defeated.

The grant of the ferry franchise of March 2, 1819, was to Samuel Wiggins, his heirs and assigns, but the place or location of the ferry was appointed upon "lands that may belong to him" at the time of the passage of the Act, and not upon such lands as his heirs and assigns might then be possessed of or subsequently acquire.

When a party has his option to set up a franchise at one place or another, with an exclusive right within a given distance of either, and he elects his situation, he cannot afterwards remove the same, although his privilege has been destroyed without any fault or negligence on his part, to the other place where he might have chosen his location, and then claim the exclusion to which he might, had he so elected, have been entitled from the latter place.

By the Act of February 6, 1821, Samuel Wiggins was restricted in his franchise to the land which he then owned, called the Piggott tract, and to which he was permitted to remove his ferry; and from this tract he had the exclusive right to ferry, and until the repeal of the second section of the Act of 1819, the exclusive right to one mile on each side thereof.

The Act of the General Assembly of Illinois, passed March 2, 1839, entitled "*An Act to authorize St. Clair county to establish a ferry across the Mississippi river*," does not violate the provisions of the eleventh section of the eighth article of the Constitution.

BILL IN CHANCERY for an injunction, &c., in the St. Clair Circuit Court, filed by the appellants against the appellees, and heard at the May term 1845, before the Hon. Walter B. Scates.

The bill states, that the General Assembly of the State of Illinois passed an Act, which was approved on the 2d day of March, 1819, by which there was granted to Samuel Wig-

gins, his heirs and assigns, the franchise of establishing and maintaining a ferry across the Mississippi river, from land near the town of Illinois which might belong to him, which ferry was to be maintained with horse or steam boats, and was to be put in operation within eighteen months from the passage of the Act; that within the time limited by the Act, the ferry was put in operation from land of Wiggins, and has ever since been kept in operation, the boats used being of the description required by the Act; that said grant was ratified and extended by the Act of February 6, 1821; that Wiggins purchased other land than that owned by him at the time of establishing his ferry, and that the land so purchased was necessary to his enjoyment of the franchise and to the discharge of his duties in the exercise of his franchise, because of the character of the stream and of its banks; that the stream often and suddenly changes its channel, and the banks are constantly falling in, so that a place suitable for the landing of a boat at one time often becomes, in a very short time, entirely unapproachable; that Wiggins continued faithfully to discharge his duties under his contract with the State; that, by sundry conveyances, the title to the property acquired by Wiggins, and to the franchise granted to him has become vested in the complainants, and that they have, since they became owners, discharged all the duties which devolved upon them as the owners of that franchise; that the General Assembly of Illinois, in violation of the Constitution of the United States, passed an Act on the 2d day of March, 1839, entitled *"An Act to authorize St. Clair county to establish a ferry across the Mississippi river,"* the provisions of which are set out in the bill; that under this Act, the Commissioners have proceeded to lay out a road of three hundred feet wide, and to take as a ferry landing three hundred feet in front of the land of the complainants upon the river; that the land so taken, is necessary to the complainants, to the secure and permanent enjoyment of their franchise, and that the franchise may become valueless without it; that the Act authorizing this taking of the complainants' property, did not in express terms require any assessment of the damages which the

complainants might sustain by the invasion of their franchise; and that their property has been attempted to be taken from them without compensation for the injury which they sustain by its appropriation to the purpose for which it has been taken; that the value of the property taken as assessed by the jury, was $600, but that no money was ever tendered to these complainants until the 19th day of July, 1842, when the amount, by the computation of lawful interest, was $680, and when the tender was made, it was only of $600; that the county of St. Clair has entered upon the land by its agents, and has leased the ferry to the other defendants, and that they are actually conducting the same on the land taken from the complainants, which land was, when the bill was filed, almost the only point for a ferry landing on all the land owned by the complainants.

Upon this bill an injunction was granted to restrain the defendants from carrying on their ferry. On the return of the process, the defendants demurred to the bill. The Circuit Court sustained the demurrer, dissolved the injunction and dismissed the bill.

*Gamble & Bates,* ( of St. Louis, ) filed the following brief in behalf of the appellants:

1. The establishment and regulation of ferries across navigable streams is a subject within the control of the Government, and not matter of private right, and the Government may exercise its power by contracting with individuals. *Blissett* v. *Hart,* Willes' R. 512; *The King* v. *Roberts,* 3 Salk. 198; *Peter* v. *Kendall,* 6 Barn. & Cres. 703; *Somerset* v. *Fogwell,* 5 do. 875; *Newburgh Turnpike Co.* v. *Miller,* 5 Johns. Ch. R. 101; *Carter* v. *Mercote,* 4 Burr. 2161; *Orford* v. *Richardson,* 4 T. R. 439; *Tripp* v. *Frank,* Ib. 668; *The People* v. *Platt,* 17 Johns. 195; *The Charles River Bridge* v. *The Warren Bridge,* 11 Peters, 569; *Same* v. *Same,* 7 Pick. 344; Act of March 2, 1839.

2. The Acts of the General Assembly of March 2, 1819, and February 6, 1821, are contracts of the State of Illinois with Samuel Wiggins, his heirs and assigns, which are pro-

tected from legislative invasion by the Constitution of the United States. *Fletcher* v. *Peck*, 6 Cranch, 87; S. C. 2 Peters' Cond. R. 308; *Providence Bank* v. *Billings*, 4 Peters, 514; *New Jersey* v. *Wilson*, 2 Peters' Cond. R. 457; *Terrett* v. *Taylor*, 9 Cranch, 43; *Dartmouth College* v. *Woodward*, 4 Wheat. 518.

3.  It is an unconstitutional invasion of the contract, for the State to take property from the complainants, which is necessary to the enjoyment of their franchise. 11 Peters, 549, 566, before cited.

4.  The Act which authorizes the taking of complainants' property, and giving it to others to be used for the same purpose for which complainants are employing it, is unconstitutional.  Ibid. 642; Constitution of Illinois.

5.  The Act of March 2, 1839, is against the Constitution of Illinois in not providing a compensation for the injury done to complainants, by taking the land for the purpose of establishing a ferry, and thus impairing the value of the complainants' franchise.  11 Peters, 420, before cited; 3 Kent's Com. title "*Franchise*," 366.

6.  The Act of March 2, 1839, has not been complied with previous to the establishment of the ferry, and, therefore, the parties could not, under that law, establish or maintain such ferry.

*J. Lamborn*, for the appellants, made the following points:

1.  In 1819, when there were no accommodations of ferrying at St. Louis, the legislature authorized Wiggins to establish a ferry.  The enterprise was then an uncertain one, and as much for the interest of the public as of Wiggins. That law was complied with, and an additional privilege conferred by the Act of 1821.  The character of the river and the common history of the country render it certain that the legislature intended to make the grant liberal enough to secure a good ferry, which could not be the case unless the liberty of frequently changing the place of landing was permitted.  It is to be presumed that the legislature acted with a full knowledge of the river and the country, &c.

2.   The said Wiggins acquired sufficient title to the land to authorize him to take the grant within the time limited. The claims of Codaire, Dumochelle and Jarrot were confirmed grants under the authority of Congress, all of which claims were included within the same limits, and all include the 300 feet in controversy.   Julia Jarrot had authority by will to convey the land, the discretion being left·to her to sell or not, &c.

3.   Wiggins invested a large amount of capital, which investment was uncertain on account of the ever varying nature of the banks, &c.; the land itself is constantly disappearing; no one point could ever be relied on for a ferry; the whole of the Codaire and Jarrot claim necessary for a ferry; the purchase of this land after the Act of 1821 was to secure the property absolutely necessary for the use of the franchise and the public convenience.

4.   The law of 1839 intended expressly to take the franchise, or apart of it from the complainants.   It required the most eligible land to be taken for the new ferry; of course, the most eligible land was necessary for the first franchise. That Act (1839) was evidently an act of legislation against capital, and in accordance with the political novelties of demagogues, &c., as is seen by the preamble.

5.   The legislature had a right to grant an exclusive ferry across the Mississippi river.

All the common law authorities referred to, prove that in England and in America, a ferry is *publici juris*, and under the control of the Government.   The grant may be more or less limited in its boundaries, time, and terms, &c., but the Government only, can confer the grant, and it may be exclusive or otherwise, &c.

6.   The legislature, having the right to grant an exclusive ferry, did, by the Acts of 1819 and 1821, make such an exclusive franchise.   Wiggins must have so understood it at the time, or he never would have invested his capital in an enterprise so uncertain.   The grant was evidently intended, at the time, to be exclusive and perpetual; the language of the two Acts can bear no other reasonable construction.

Mills *et al. v.* The County of St Clair *et al.*

7. A grant is a contract executed. It is admitted every where, that whatever is granted cannot be revoked. The legislature has no more right to take back its franchises than its lands; and it is not parting with State sovereignty any more than in a case of grant for lands. The Government can neither revoke nor destroy its grants.

8. What is granted cannot be revoked, and in this grant the reasonable, natural, necessary construction of the grant is co-extensive with the land of Wiggins, his heirs and assigns; most certainly including enough of land to run the ferry at all times and under all circumstances. All is granted which is necessary to the use of the grant. It would be absurd to give any other construction, and without the application of our views in this respect, no ferry can ever exist at the point or place now in discussion.

9. The franchise is property, fixed, determinate property, entitled to the protection of the law as other property, with reasonable limits, subject to be measured and bounded as other property, which measures and boundaries must be sufficient to make the grant useful for its purposes, and as extensive as the terms of the grant, &c.

10. The Government can take any and all private property for public uses.

The use must be for the public;

There must be a public necessity; and

There must be an adequate compensation.

In this case the property was taken for private use, without any public necessity, without compensation, and entirely for political and personal speculation. To establish a permanent ferry, not only three hundred feet will be required, but all the land of the complainants.

11. The Government cannot take the property of A. and give it to B. to be used in the same way that A. before used it. The road was leased out by metes and bounds to an individual, &c., for private purposes, as is shown in this case by express averment of the bill, and by the plat which is extensively referred to in the bill, and which is a part of the record in this case, &c.

12. The bill expressly states that this identical three hundred feet is necessary for the original ferry, and that the complainants cannot do without it; that they have to go six hundred yards further up the stream without this land, thereby making each trip twelve hundred yards of increased travel in a rapid current, &c. It is, therefore, a part, and a very important part of the original franchise which is unjustly taken from the complainants.

13. No payment of damages has ever been made even for the land, and not even a thought entertained of ever paying for the property in the franchise. No legal and sufficient tender has been made, &c., of the $600.

14. In the case in 11th Peters, it was admitted that the public interests required a new bridge; not so here; and that even then the original franchise could not be taken away. In the case now pending, the attempt is to take the identical franchise, or a considerable part of it.

15. There must be a conservative element somewhere. The common law principles lie at the foundation of all of our rights of property, liberty and life; and whenever these old rules of law are abandoned, there is danger of practical despotism. Who would invest capital in this kind of property, if it is to be rendered unsafe and uncertain? The legislature is constantly encroaching on other departments of the Government and on the rights of the citizens. Politicians may indulge in novelties, but Courts of justice should stand by the law, the old, the common law, &c.

*J. Gillespie,* and *L. Trumbull,* for the appellees.

1. There is no statute authorizing interest upon damages assessed for right of way, and it is not pretended that there was any agreement to pay interest. At common law, if no agreement for interest be made, it cannot be recovered, although the payment of the debt should be unreasonably delayed. *Madison Co. v. Bartlett,* 1 Scam. 67.

If the rule were otherwise as between individuals, still in this case, the plaintiffs could not recover interest, because the damages are to be paid out of the county funds; and a

county or State is never bound to pay interest, unless there be an express contract to pay it. The provision of the statute, requiring a party to pay interest upon a liquidated sum of money after it becomes due, is expressly decided not to apply to counties. Ib. 72.

2. If compensation is secured before the property is taken, it is sufficient. It need not be actually paid to the owner. 1 U. S. Dig. 560, § 140, and authorities there cited; *Rogers* v. *Bradshaw*, 20 Johns. 735.

The property of the county may be considered an adequate fund for the payment of the damages. *Bloodgood* v. *M. & H. R. R. Company*, 18 Wend. 18.

3. It is incident to the sovereignty of every State, that it may take private property for public use, of the necessity and expediency of which, the Government must judge. 1 U. S. Dig. 560, §§ 143, 144, and authorities there referred to.

It is said that a portion of the three hundred feet is used for private purposes. If such were the fact, Chancery would have no jurisdiction of the matter. The three hundred feet are declared to be a public highway, and if obstructed, the proper remedy is by indictment. Rev. Stat. 175, § 34; or by action of trespass for the exclusive appropriation of the soil, the fee being in the original owner. 2 Johns. 357; 15 do. 447; 12 Wend. 98.

4. The constitutional power of the legislature to authorize private corporations to take the property of individuals without their consent, for the construction of rail roads or ferries, is directly established in the case of *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 9, 16, 21; 3 Paige, 74.

The principle is well established, that the owner of land, or other property, holds it subject to the right of eminent domain in the State for public purposes, and the legislature can designate the public purposes to which it is to be applied. Vattel, ch. 20, § 244; Const. U. S. Art. 5, amendments; Const. Ills., Art. 8, § 11; 2 Kent's Com. 339, 340; 2 Johns. Ch. R. 166; 5 Peters' Cond. R. 389; 11 Peters, 577–9, 645, 651; 1 U. S. Dig. 560, § 144.

The principle that forbids the resumption of one's own grant, does not apply to the eminent domain. A turnpike road may be appropriated to make a canal, 20 Johns. 735; and no property, whether it be a franchise or land, is so holy that it cannot be taken for public uses when the paramount good of the Government requires it. The owner of the ferry need not be the owner of the soil. It is sufficient if he have the right to land, and the landing place be a public highway. 6 Barn. & Cres. 703; 13 Eng. Com. Law R. 299.

5. From an examination of the Acts relating to this ferry, it will be found that the Act of 1819 conferred on Wiggins and his assigns, simply a *license* to keep a ferry and nothing more. This Act of the legislature stood in the place of the special order made by the County Commissioners in cases of ferries established by them. This is manifest from the fact, that the ferry was expressly *made subject to the same regulations as ferries then, or afterwards to be established.* The legislature and the County Commissioners' Court have, therefore, the same power and control over this as over any other ferry in the State.

A grant of a ferry over a public water course, and for the convenience of the community, is not such an exclusive grant as the Government cannot resume at their pleasure. *Dyer* v. *Tuscaloosa Bridge Co.*, 2 Porter, 305.

6. The Act professes to authorize Samuel Wiggins to establish a ferry on and across the waters of the Mississippi river. Has the legislature any power to make such a grant? A ferry is defined to be a highway on the water, Tomlin's Law Dic. title *"Ferry;"* and the right of the legislature to establish ferries across waters within its territorial jurisdiction is not questioned; but surely it can have no authority to establish ferries over waters lying beyond the limits of the State. The proposition, that the laws of the State can have no operation beyond its territorial limits, is too plain to be controverted.

7. The rule of construction of grants of this kind is well settled, that the grantees can take nothing by implication,

and have only such privileges as are clearly conferred. 2 Kent's Com. 298; 3 do. 459; 4 Peters, 168, 514; 11 do. 544–8; 22 Eng. Com. Law R. 185; 6 Paige, 554, 565.

Wiggins' grant was restricted to such lands as *then* belonged to *him*, and not to such as he might acquire in eighteen months after the passage of the Act.

The Act of February 6, 1821 did not confer any additional privileges upon Wiggins, but merely authorized him to remove the ferry to any other part of his land, in consequence of the formation of a sand bar so as to interfere with his landing. This was not a continuing power, authorizing him, from time to time and as occasion might require, or he might deem advisable, to remove his ferry from one portion of his land to another. It simply authorized a removal of the ferry, not removals of it. He could make but one removal under that law, and when made, the ferry again became fixed and established.

8. Wiggins received his license to establish a ferry with the express provision in it, that the legislature might repeal this exclusive privilege, whenever the public good should require it. That the plaintiffs have no implied rights under the Act of 1819, which takes from the legislature the power, through all time, to establish other ferries so as to interfere with the first, is expressly decided in the case of *The Charles River Bridge Co.* v. *The Warren Bridge Co.*, 11 Peters, 420.

That was a much stronger case than this, and settles conclusively that there are no such implied rights, and that the owners of the first bridge, or ferry, have no such rights in a line of travel as will authorize them to enjoin the construction of other bridges and ferries, whenever the public good requires them. 6 Paige, 554.

9. The plaintiffs are only injured in the receipt of profits from travel, by the establishment of the new ferry, and for this they are not entitled to damages. They have no property which has been taken by defendants, because they cannot have a property in a line of travel. As well might a tavern keeper, or a miller enjoin the erection of any other

tavern or mill, till he was paid the damages or losses which he would sustain by a loss of a part of his custom. *Callender* v. *Marsh*, 1 Pick. 417, 430–5; 4 Barb. & Har. Dig. 2, and authorities there cited.

Every great public improvement must, almost of necessity, more or less affect individual convenience and property, and when the injury sustained is remote and consequential, it is *damnum absque injuria*. *Lansing* v. *Smith*, 8 Cowen, 146, 155, 156.

The ferry of the plaintiffs is not interfered with by the defendants. They still have the same right to ferry and demand tolls as heretofore. Although their profits may be affected by the establishment of another ferry, still their property has not been taken, because they cannot, as has been before remarked, have a property in travel. In the Charles River Bridge case, the Supreme Court of the United States denominate this claim of property in travel, *"an unknown and undefined property."* 11 Peters, 552.

10. Injunctions will never be granted, if the right be doubtful. 3 Cowen, 755.

*S. T. Logan* concluded the argument in behalf of the appellants.

The Opinion of the Court was delivered by

Purple, J.* On the 8th day of March, A. D. 1845, the appellants, complainants in the Court below, filed their complaint against the appellees, the defendants, for a perpetual injunction against the defendants, enjoining them and all their confederates and agents from further maintaining and carrying on the ferry which they had established, or any ferry from the lands of the complainants, particularly described in their bill, and for such other and further relief as their case might require, and as to the Court might seem meet.

The complainants set forth, that from the earliest period in the settlement of the western part of Illinois, there has ex-

---

. *Koerner, J., did not sit in this case.

Mills *et al.* *v.* The County of St. Clair *et al.*

isted a constant intercourse between the inhabitants of that country and the town of St. Louis, in the present State of Missouri, which increased with the rapid increase of population in Illinois; and as St. Louis was the only point on the Mississippi river, so far as it was a boundary of Illinois, where there was any commerce of importance, the citizens of Illinois have felt considerable interest in maintaining intercourse. That in the year 1819 and previous thereto, there was scarcely any navigation of the river by steam power, and the citizens of Illinois, in passing to St. Louis, could only journey by land to the river at a point opposite the town and cross the river by an ordinary ferry, furnished only with common boats, propelled by men with oars, so that when the river was more than usually high, or affected by high winds, or when drift wood or ice in large quantities was floating on its surface, the passage became not only difficult but often exceedingly dangerous, and thus vexatious and expensive delays were occasioned to those desiring to cross the stream. The people of Illinois felt that their own interests and convenience required that some expedient should be adopted, by which the difficulties and inconveniences experienced in visiting St. Louis should be obviated, and they judged it necessary to afford such encouragement to individual enterprise as would induce the employment of capital in increasing the facilities of transportation required at this point. One Samuel Wiggins, believing that he could derive advantage from the accommodation of the public, was willing to embark in the business of maintaining a ferry, which would render the transportation certain and secure. Under these circumstances, an Act was passed by the people of the State of Illinois, represented in the General Assembly, which was approved March 2d, 1819, whereby it was enacted that said Samuel Wiggins, his heirs and assigns, were authorized to establish a ferry on the waters of the Mississippi, near the town of Illinois in this State, and to run the same from lands at said place that might belong to him; provided that he should not use any boat or water craft except such as should be propelled by steam, horses, oxen or other four footed ani-

VOL. II.                              14

mals; and provided that the said Samuel Wiggins, his heirs and assigns, should have said ferry in actual operation within eighteen months from and after the passage of said Act. And by the second section of that Act, it was further enacted, that no persons except those who had ferries then established at that place should establish a ferry of the description aforesaid, within one mile of the ferry established under that Act; and if any person or persons should, contrary to the provisions of that Act, run any boat or boats of the description aforesaid, he, she or they should forfeit every such boat, with its furniture, &c., to said Samuel Wiggins, his heirs and assigns, which might be attached and recovered before any Court in the State of competent jurisdiction.

By the third section of said Act it was enacted that it might be lawful for said Samuel Wiggins, his heirs and assigns, to demand and receive the same rates of ferriage as were then of right demandable at the ferry established nearest to the ferry authorized to be established by that Act; provided, that no more should be charged for a wagon, cart, or other carriage, if loaded, than could be charged if empty.

By the fourth and last section of the Act, it was enacted that the ferry thereby established should be subject to the same taxes as were then, or thereafter might be imposed on other ferries within said State, and under the same regulations and forfeitures, and that if the provisions of the second section of that Act should be made to appear to the General Assembly to be injurious to the public good, that then and in such case the said section might be repealed.

Complainants further state that said Samuel Wiggins, immediately after the passage of said Act, commenced preparations for establishing the ferry under his contract with the State of Illinois, and on the 4th day of March, 1820, obtained a deed from James Piggott and Zaccheus Piggott, two of the heirs of James Piggott, deceased, for two undivided seventh parts of a certain tract of land of one hundred acres, on the Mississippi, near the town of Illinois, the title to which land was in the heirs of James Piggott, regularly derived from the Government of the United States.

The said Samuel Wiggins having acquired an interest in said tract of land, proceeded immediately to establish the ferry across the Mississippi river according to his contract with the State of Illinois, and to run his boats from the land granted and confirmed to the heirs of James Piggott, using in said ferry only boats propelled by the power of horses, and in less than eighteen months from the 2d day of March, 1819, the said Samuel Wiggins had the said ferry in actual operation, and using boats which were propelled by horses, and he used at said ferry none other than boats thus propelled. Said Samuel Wiggins entered into the possession of the lands granted as aforesaid to the heirs of the said James Piggott, immediately after his purchase from two of the said heirs, and until the sale made by said Wiggins, as is hereafter mentioned, he continued to possess the said land, and continued until said sale to maintain and keep his said ferry in full operation, increasing the means of transportation as the public wants required, and changing the boats employed from those propelled by horses to boats propelled by steam, so as to comply with the letter and spirit of the said Act of the General Assembly, and fully to discharge his duty under his contract with the State of Illinois.

The said Samuel Wiggins on the 19th day of May, 1821, by deed of that date, acquired from John McKnight and Thomas Brady, they being the owners of the interests of the other heirs of James Piggott, deceased, in the tract of land above described, all the right and title of those other heirs in and to said land, as the same had been confirmed to them, a copy of which deed was exhibited. Said McKnight and Brady acquired their title to said land from Joseph Piggott and Hannah, his wife, Daniel Quick and Fanny, his wife, Wm. Patterson and Asenath, his wife, and Newton Piggott, by deed duly executed January 4, 1815, a copy of which was exhibited, and Joseph Piggott, Fanny Quick, Asenath Patterson, and Newton Piggott, who made their deed to said McKnight and Brady, and the said James Piggott and Zaccheus Piggott, who made their deed to Samuel Wiggins, were the heirs of the said James Piggott, deceased, to whom

said tract of land had been confirmed and granted by the United States.

On the 18th day of January, 1813, Michael Jones, then register of the land office for the district of Kaskaskia, transmitted to the Secretary of the Treasury of the United States a list of claims to lands within said district, with a recommendation that the same should be confirmed by the Government of the United States, and thereupon Congress passed an Act, approved April 16, 1814, confirming to the claimants the lands in said list specified, and among the rest the claim under Pierre Codaire, or his legal representatives, as appears by reference to said Act of Congress, and to the certified extract from the list of claims reported by Michael Jones, and portions of his letter accompanying the same were exhibited as part of complainants' bill. Before the said confirmation said Pierre Codaire had died, leaving as his only heir his son Joseph Codaire, who, by his deed of the 17th day of April, 1809, conveyed to Nicholas Jarrot all his right to the tract of land which had been claimed and cultivated by his father, the said Pierre Codaire, and said deed was exhibited as part of the bill of complainants, which last mentioned tract of land contains four hundred acres, and lies on the Mississippi river opposite to the town of St. Louis, and near to the town of Illinois, and has been regularly surveyed under the authority of the United States, and the title thereto was, by the confirmation of said Act of Congress, and by the deed of the said Joseph Codaire, vested in the said Nicholas Jarrot in fee simple.

The commissioners in the Kaskaskia land district, under the authority conferred by the Act of Congress of the 26th March, 1804, entitled "*An Act making provision for the disposal of the public lands in the Indiana Territory, and for other purposes,*" reported their decisions to the Secretary of the Treasury on the 31st day of December, 1809, and in their report was embraced a claim to one hundred acres claimed by Nicholas Jarrot under Jean Dumochelle, which they reported as affirmed by them, the same being entered by them in their report of claims within the district of Kaskas-

kia, founded on the Act of Congress granting a donation of one hundred acres of land to each militia man, enrolled and doing duty in the Illinois on the 1st day of August, 1790. In their report, the commissioners described the said tract of land of one hundred acres as surveyed in virtue of an order from the Government, on the banks of the Mississippi and the Cahokia creek, which tract is particularly described in said bill of complaint; all which appears by reference to the second volume of the American State Papers, selected and edited under the authority of the United States by Walter Lowrie, Secretary of the Senate, containing documents legislative and executive of the Congress of the United States in relation to the public lands, which said decision of the said commissioners was duly confirmed by the Congress of the United States, by the Act of the 1st day of May, 1810, whereby the title to the said one hundred acres of land was vested in the said Nicholas Jarrot. The said claim of the said Nicholas Jarrot, so confirmed as aforesaid, was so surveyed as to be included within the survey of the said tract of four hundred acres confirmed under the said Codaire as before described, all which appears by official survey from the office of the Surveyor General filed with complainants' bill and made a part thereof, and which said tract of one hundred acres joins the tract of land held by said Wiggins under the heirs of the said James Piggott as before mentioned, and is near to the town of Illinois.

About the month of December, 1820, said Nicholas Jarrot departed this life, having previously made and published his last will and testament in due form of law, which has been duly admitted to probate in said county of St. Clair, and by said will empowered his widow and executrix, Julia Jarrot, to sell and dispose of such parts of his real estate, as she might think proper, in order that she might live in the most easy and independent manner, and devised all his real estate to her for life, which power and contemplated provision for his widow was over and above and independent of her right to her own portion of the estate under the community established by the marriage contract between the said Nicholas

Jarrot and his said wife, a copy of which will was exhibited as part of the bill. (*Ante*, 135.)

The said Julia Jarrot on the 13th day of July, 1822, by her deed of that date, conveyed to the said Samuel Wiggins in fee simple the said tract of four hundred acres of land, so confirmed under the claim of the said Pierre Codaire as aforesaid, the title to which was in the said Nicholas Jarrot at the time of his death; and also all the right and title which said Nicholas Jarrot might have had at the time of his death to any piece of land lying and being on the said tract of four hundred acres, which deed duly acknowledged and recorded was exhibited as part of the bill.

The said Samuel Wiggins, from the time of the conveyance to him by the said Julia Jarrot as before mentioned until the time of the sale and conveyance by him as is hereinafter stated, continued in possession of the said tract of land so acquired by him and held under the said Codaire and the said Jarrot, embracing the said tract of one hundred acres confirmed to the said Jarrot under the said Jean Dumochelle.

The complainants state, that the bank of the Mississippi river opposite the town of St. Louis is an alluvial formation, continually falling into the river as the action of the water wears away the sand, and there is also from the character of the stream and of the shores of the river a very frequent shifting of the current, sometimes forming bars, where, but a short time before, there was deep water, and again sweeping away the sand bars and in their place establishing for a short time the main current of the river. From this liability to frequent changes in the current of the stream and in its banks, it was necessary for the said Wiggins, in order to fulfil his contract with the State of Illinois, to acquire the title to a large space of land on the bank of the river, in order that he might change the place of landing as the changes of the river and its banks might require. This necessity was enhanced by the fact, that there existed an island in the river opposite to the upper end of the town of St. Louis, which was regularly increasing and extending down the stream so as to interfere with the direct crossing of the river.

The complainants claim that the said Samuel Wiggins, his heirs and assigns, were entitled, under the Act of the General Assembly of the State of Illinois before mentioned, approved March 2, 1819, to the perpetual franchise of maintaining a ferry across the Mississippi river, from any point near the town of Illinois, from any land that might at any time belong to him or them, so that the conditions of the law were complied with; yet, the said Samuel Wiggins, in order to avoid any difficulties or questions that might arise, applied to the General Assembly of the State of Illinois on the 6th day of February, 1821; an Act was passed by said General Assembly, by which, after reciting that the said Samuel Wiggins, his heirs and assigns, were authorized to establish a ferry on the waters of the Mississippi river, near the town of Illinois, in the State of Illinois, and that a sand bar had been formed since that time opposite said ferry, it was enacted, that the said Samuel Wiggins was thereby authorized to remove said ferry on any land that might belong to him on the Mississippi river, and that his heirs and assigns were thereby authorized to remove said ferry to any land that might belong to them on the said Mississippi river, under the same privileges that were presented by the Act, entitled *"An Act to authorize Samuel Wiggins to establish a ferry upon the waters of the Mississippi,"* approved March 2, 1819; and the complainants presented, as part of their bill, the Act of the General Assembly of the State of Illinois, entitled *"An Act to authorize Samuel Wiggins to make a turnpike road, and for other purposes."*

They state, that the said lands acquired by Samuel Wiggins from the said Julia Jarrot, widow, devisee and executrix of the said Nicholas Jarrot, deceased, was necessary to the said Samuel Wiggins, and to his heirs and assigns, as owners of the ferry franchise granted by the State of Illinois as aforesaid, in order to the secure and convenient conduct of the ferry, as the changes of the river might require changes in the places of landing.

The said Samuel Wiggins, on the 1st day of August, 1831, by deed of that date, conveyed all the lands before mentioned as having been acquired under the heirs of James Piggot, deceased, and under the said Codaire and said Jarrot,

to John O'Fallon, Adam L. Mills, Bernard Pratte, now deceased, William C. Wiggins, Sam'l. C. Christy, now deceased, and Charles Mulliken, together with the ferry franchise as granted to him by the Legislature of the State of Illinois, as appears by the deed, of which a copy was exhibited as a part of said bill.

The said John O'Fallon afterwards, by his deed dated February 1, 1838, conveyed the one half of the interest acquired by him under the deed of the said Samuel Wiggins to John H. Gay, in fee simple, as appears by the deed of the said O'Fallon and his wife to said Gay, a copy whereof was exhibted. And the said John O'Fallon, by his deed of the 18th day of December, 1843, conveyed to the said complainant, Andrew Christy, all his remaining interest in said premises, as acquired from said Samuel Wiggins, as appears by the deed of said O'Fallon exhibited. The said Adam L. Mills, by his deed of the 13th day of October, 1840, conveyed to said Andrew Christy, another of the complainants, in fee simple, one half of the interest and title acquired by him, said Mills, by the said deed from said Wiggins, in the said lands and ferry franchise, which deed from said Mills to said Christy was exhibited.

The said John O'Fallon, on the 12th day of January, 1832, became the purchaser of the tract of land above described as claim 99, survey 579, under and by virtue of the laws of the State of Illinois, for the taxes for the year 1831, with the interest and costs chargeable on said tract of land, and the same was, in pursuance of the laws of Illinois, duly conveyed to said O'Fallon by the Auditor of Public Accounts of that State, by deed dated 10th February, 1835, which purchase from the State of Illinois by said O'Fallon was made by him in his own name for the use of all the owners of said land and ferry franchise and their assigns and representatives, and the said deed was so held by him in trust for the use aforesaid, until the same was conveyed by the said O'Fallon, as herein stated, which deed was exhibited as part of said bill.

The said John O'Fallon, on the 18th of March, 1844, by deed of that date, conveyed among other things all the right

and title acquired by him in the said tract of land under his said purchase for taxes, as above stated to these complainants, as appears by the deed therewith exhibited as part of complainants' bill. After the purchase from said Samuel Wiggins by the said John O'Fallon, Adam L. Mills, William C. Wiggins, Charles Mullikin, Bernard Pratte, and Samuel C. Christy, said Bernard Pratte and Samuel C. Christy departed this life, the said Bernard Pratte leaving the complainants, Emily Pratte, his widow, and the complainants, Emily Crooks, Bernard Pratte, Therese Penguit, Celeste Niedlet, Pelagie Bogy and Diane Blaine, his children and only heirs, and the said Samuel C. Christy leaving at his death, the complainant, Melanie Christy, his widow, and Joseph A. Christy, Elizabeth Christy and Mary F. Christy, his children and only heirs, which Joseph A. Christy, since the death of the said Samuel C. Christy, has departed this life an infant and without issue. By means of which said several conveyances and descents, the said complainants have acquired all the right and title, which the said Samuel Wiggins had in and to the land before described, and the ferry franchise granted to him by the State of Illinois as aforesaid, and have furnished suitable means of transportation at said ferry, and proper accommodations for the speedy and secure passage of all persons and property offered to be crossed over said river, using only such boats as are required by said Acts of Assembly to be used; and the complainants say, that in full faith and reliance upon the inviolability of the contract between the State of Illinois and the said Samuel Wiggins, they have paid and invested a large sum of money in the purchase from the said Wiggins of his right to the said land, and the ferry privilege to which he was entitled from the grant to the said Wiggins, his heirs and assigns, by the State of Illinois; but now, contrary to the wishes and against the consent of complainants, in violation of their rights and of the solemn contract of the State of Illinois, and in violation of the first clause of the tenth section of the first article of the Constitution of the United States, which prohibits the States from passing any law impairing the obligation of con-

tracts, an Act was passed on the 2d day of March in the year 1839, by the General Assembly of the State of Illinois, entitled, "*An Act to authorize St. Clair county to establish a ferry across the Mississippi river,*" whereby Wm. G. Brown, John D. Hughes, James Anderson, Wm. Penn and Charles Sargent of St. Clair county were appointed commissioners, and were required to examine the ground, and locate a road and ferry landing between Cahokia creek and the Mississippi river opposite St. Louis; and, it was thereby further enacted, that the said road and ferry landing should be located three hundred feet wide on the most eligible ground for said purpose, and the said road and ferry landing, when so located, and the report of said commissioners filed in the office of the County Commissioners' Court of said county of St. Clair, should be and remain a public highway forever; and that the County Commissioners' Court of said county might cause said land, on which said road and ferry landing should have been located, to be condemned, and pay the legal owners of said land the damages sustained by said owners; and if said land should be condemned and said damages paid out of the funds of the county, the said County Commissioners' Court should have power by their agents, or otherwise, to enter upon said land so condemned, and establish a ferry across the Mississippi river, and that said County Commissioners' Court might either carry on said ferry for the county itself, or it might lease the same for any term not exceeding five years at any one time to any persons; and it was further enacted by said Act, that for the purpose of compensating the legal owners for the land thus appropriated, it should be the duty of the Commissioners' Court to cause the sheriff of St. Clair county to summon twelve men, who should assess the damages which such owners of the land might sustain by reason of the location of said road and ferry landing.

The said commissioners, Wm. G. Brown, John D. Hughes, James Anderson, Wm. Penn and Charles Sargent have, under color of the last mentioned Act of Assembly, proceeded and laid out and located said road three hundred feet wide across

said tract of land belonging to complainants, which is near to the town of Illinois, and have made their report as required by said Act of Assembly, as complainants have been informed, and proceedings have been had for the condemnation of the said land under said Act of Assembly, by which the damages were assessed at $600, and a verdict for that amount was entered at the April term of the Circuit Court for Jackson county, Illinois, in the year 1840, but no payment of said damages has ever been made, and no money was ever tendered until the 19th day of July, A. D. 1842, at which time the said verdict, including principal and interest, amounted to $680, or thereabouts; and complainants admit, that at the time last specified, the sum of $600 (being part of the said $680) was tendered to them, and they refused to accept and receive the sum thus tendered as a compensation for their property thus attempted to be taken from them.

The value of the said three hundred feet of land for the purpose of a ferry landing and ferry franchise, was not taken into consideration by the Court and jury in the said assessment of damages; but, on the contrary, the said Court expressly directed and instructed the jury to assess the damages, which the complainants would sustain by reason of said road being located on the said land, without any reference to the ferry landing, ferry franchise and ferry privileges, connected with the said road and appertaining to said road, and the $600, so assessed, was the amount of damages, which, in the opinion of the jury, these complainants would sustain by virtue of the location of said road only, after excluding therefrom the injury to complainants by impairing their ferry franchise and depriving them of the best part of their ferry landing.

The said three hundred feet include a wider space and more land than is necessary or convenient for a road, and but a small portion of it has been used and appropriated by the county of St. Clair to that purpose, leaving a strip on either side to be used by the said county of St. Clair and its lessees as private property, and that portion of the three hundred feet, which is not included in the said road, and which is now used for private purposes, or is left to be thus

used, will yield an annual ground rent larger than the whole amount of damages assessed as aforesaid for the whole of said three hundred feet.

The said county of St. Clair has, through its agent, entered upon and taken possession of the whole of said three hundred feet of land, and has leased the same, together with the said road and ferry landing, and the ferry established under said last mentioned Act of the General Assembly of Illinois, to James Harrison for the term of five years, a copy of which lease was exhibited as part of the bill; and said Harrison, as such lessee, has entered upon said three hundred feet of ground, and is using the same as his private property, and is actually engaged in running a ferry therefrom across the Mississippi river to the city of St Louis, and has thus not only established a ferry, rivalling and injuring the ferry of complainants, but is using to their injury what they consider to be a part of their ferry landing, and has deprived them of the use and occupancy of that very portion of their said tract of land, which is necessary to the full enjoyment of their ferry franchise, and the full performance of their contract with the State of Illinois.

The said three hundred feet of ground, upon which said road and ferry landing have been located by the county of St. Clair, is part of the said tract of land purchased by the said Samuel Wiggins, and appropriated by him to the purposes of a ferry landing as aforesaid, in pursuance of the said two Acts of the Illinois Legislature, approved March 2d, 1819, and February 6th, 1821, and now owned by complainants as the assigns of the said Samuel Wiggins, and as heirs, assigns and representatives of certain of his assigns. The complainants claim, that by virtue of these two Acts of the Legislature of Illinois, and of the purchase of the said tracts of land by the said Samuel Wiggins, and the application of the same to the purposes of a ferry landing, in accordance with those acts, the whole of the said tract of land became the ferry landing of the complainants, appropriated to them by the Legislature of Illinois for that purpose.

The complainants further state, that in consequence of a sand bar, or island having formed opposite to their said

ferry landing, and having enlarged and varied by the floods in the river, and of the obstructions on the Illinois shore occasioned by the action of the water and the formation of sand bars, they have been compelled to remove their said ferry landing, from time to time, and from place to place on said tract of land, and were, at times, in the habit of landing their ferry boats above, below and in the immediate vicinity of the said three hundred feet of ground now used by the said lessee of St. Clair county as a road and ferry landing; and that, at different seasons of the year, and at various stages of the water in the river, these complainants, on account of the causes and obstruction aforesaid, are compelled to land their ferry boats at different places on their said tract of land, and to change the same as the water in the river may rise or fall; for instance, in high water, they are required to land at one place; in low water, at another; and so varying their points of landing as the water in the river may destroy it, at one point, and afford a safe and convenient landing at another, nearly from one end of said tract of land to the other.

During the recent floods, the action of the water has produced such further changes on the banks, sand bars and channels of said river, as to render said three hundred feet of ground, now used by said lessee of St. Clair county as aforesaid, not only the most convenient point for a ferry landing, but the only point on said tract of land at which boats can be safely landed, where a road approaches the river, or the travel can conveniently reach it, without running up the river at great trouble and expense from the lower point of the island below, which they cross, a distance of about six hundred yards, making the trip about twelve hundred yards more than complainants would be required to run, if they were allowed to use the said three hundred feet of ground, which belongs to them as a ferry landing.

During the winter season while the floating ice is running in the river, the complainants' steam ferry boats, which they have purchased at a great expenditure of money, and are now using for the transportation of passengers and property at their said ferry, cannot run up stream against the rapid cur-

rent and floating ice, and hence they may be compelled to stop their ferry, violate their contract with the State of Illinois and forfeit their ferry franchise, unless they are permitted to use the said three hundred feet of their own land, of which the said lessee of the county of St. Clair has deprived them of the possession and use as aforesaid.

The complainants invoke the Constitution of the United States, and particularly the first clause of the tenth section of the first article thereof, as their protection against the unjust legislation which has been adopted by the General Assembly of the State of Illinois, whereby the solemn contract of the State, contained in the grant of Samuel Wiggins, his heirs and assigns, as expressed in the Act of Assembly of the 2d day of March, 1819, and the Act of the 6th day of February, 1821, before mentioned, has been most materially impaired, and against the proceedings of the commissioners appointed to lay out said road, and of the County Commissioners' Court of St. Clair county in pretending to carry into effect the unconstitutional legislation, by taking a part of the very landing or terminus of the ferry of complainants to establish thereon another ferry. Complainants also invoke the Constitution of Illinois as their protection against the legislation of the State and the proceedings under color thereof, whereby the property of complainants has been attempted to be taken for a private and not a public use, and for the very use for which complainants were applying it, and by which no compensation is provided for them for the damages done to them by the use to which said property is to be applied.

The complainants exhibit, as part of their bill, a plat of a survey made by the surveyor of the city of St. Louis with the view to improve the harbor of St. Louis, and which exhibits the shore of the river Mississippi, as it existed when the public surveys were made of the lands claimed by them under Jarrot, and under the heirs of Piggot above mentioned, whereby it appears that survey No. 624, which is the survey of the tract under the heirs of Piggott, more than the half and nearly two thirds of the whole tract, had been carried off by the river, when this survey by the surveyor of

HARVARD
LAW SCHOOL
LIBRARY.

Plan of the Camp of St. Louis State of **MISSOURI**

**ILLINOIS**

STATE OF

BLOODY ISLAND

WHARF

Old ferry Landing

New ferry landing
Old ferry landing
New ferry landing

Old ferry Landing Fall 1849

DUNCANS

Old ferry Landing Winter 1847/48

Winter 1848

Old ferry Landing

New ferry Landing  NEW FERRY

Landing

Landing

Landing

Landing

766

759

579

1644

Roads to Edwardsville

the city was made; the quantity carried off being greatly increased by the freshet of this present year; and it further appears, that of survey No. 579, which is the survey under Dumochelle, about one third part of the tract has been carried off by the river. Said plat further shows that the line, which represented the Illinois shore of the river, at the period of those surveys, is now, in some places near the western shore of that channel of the river, which is on the east of Bloody Island. The size and position of Bloody Island, as it existed at the time of the original surveys in the year 1818, is represented on said plat by the parallel lines, drawn on the figure of said island, as it now exists, with the increase which it has gained at the lower extremity, is also shown on said plat, whereby it appears, that the said island has nearly doubled its length since it was originally surveyed. The said plat also shows, on the Illinois shore, the points on which the road has at different periods reached the river, and where, at different times, the landing of the ferry of the said Wiggins and of the complainants has been. Although the points of said landings have been long since far in the river, the roads leading to them show their relative positions, and the distances from each other. The said plat shows the changes in the landings of the ferry of the complainants, which have become necessary by the changes in the channel of the river, and by the increase of Bloody Island; and it appears that it has already been necessary to remove the place of landing about one half mile down the river, from the point at which the ferry was formerly established. The said plat further shows the course which the boats of the complainants are now compelled to take to cross the river, in order to pass around the lower point of the sand bar, which continues to increase at the lower point of the island. The said plat also correctly represents the relative position of the landing now used by complainants, and that used by the said James Harrison for the ferry which he is now conducting; and it appears that the very point which he now occupies for the landing of his boats, may, at any time, become absolutely necessary to these complainants

for the proper management of their ferry. The said plat also shows on the eastern shore of the river the point, on which the landing of the ferry under said Samuel Wiggins was formerly established being at Oak street, now Morgan street, in the city of St. Louis, which is directly opposite to the highest landing on the Illinois shore, and the said plat shows how the increase of the length of the island has compelled a change in the ferry landing on the Missouri shore, which said plat has been made from actual and accurate surveys and was exhibited as part of the bill.

The said James Harrison now occupies and uses property of these complainants, which has been attempted to be taken from them by unconstitutional legislation, and is employing it to injure and further to oppress these complainants, and he is so employing the said property under the county of St. Clair.

The bill of the complainants is verified by oath, and on the order of one of the Justices of the Supreme Court, a writ of injunction was issued in accordance with the prayer of the bill against the defendants, their agents, &c. The defendants demurred generally to the bill of complainants, and the complainants joined in the demurrer; upon argument whereof, and the matters arising thereon, the Circuit Court sustained the demurrer, and decreed the dismissal of the complainants' bill, and dissolved the injunction granted thereon, and the recovery, by the defendants of their costs and charges against the complainants, who have appealed to this Court, in which they assign for error in the proceedings in the Circuit Court, the following:

1.   The rendering in that Court of a decree in favor of the appellees, when, by the law of the land, the same should have been rendered in favor of the appellants;

2.   That said Court decreed a dissolution of the injunction which had been issued in the cause, when, by the law of the land, the said injunction should have been made perpetual; and

3.   That the Circuit Court dismissed the bill of the said appellants when, by the law of the land, the appellants were entitled to the relief prayed in the said bill.

From this statement of the case, prepared by the counsel for the complainants, it sufficiently appears, that on the 4th day of March, 1820, one year and two days after the passage of the Act granting him the ferry franchise, Wiggins was the owner of two undivided seventh parts of the one hundred acres of land designated on the plat as the Piggott claim and numbered 624, and that on the 19th day of May, 1821, he acquired title to the residue of said tract; that on the 13th day of July, 1822, he was the owner of the Codaire tract, also designated on the plat, containing four hundred acres, and including claims numbered 624, 766 and 579. And from the survey and plat exhibited and made part of the record, it appears that at the time of the filing of complainants' bill, both complainants' and defendants' ferry landings were situated on claim No. 579, the title to which was acquired by Wiggins on the 13th day of July, 1822, one year, five months and seven days after the passage of the law of the 6th day of February, 1821, allowing said Wiggins to remove his ferry upon other lands that might belong to him. The title to all the tracts of land thus acquired is, by the bill, traced sufficiently for the purposes of this suit by divers mesne conveyances into the present complainants. Unless it may be inferred from the plat exhibited, it is not shown by the bill upon which particular tract of land Wiggins first established his ferry; nor when, if he removed the same upon other lands, this removal was made.

We have carefully and attentively considered the questions involved in this case, and have formed our opinions and conclusions upon the most mature deliberation. That the legislatures of the several States possess the power, within their limits, to establish and regulate ferries is a principle which, at this day, cannot be successfully controverted. And that that power is sufficiently extensive to authorize a grant for the construction of such ferry from the Illinois shore on the waters of the Mississippi, in the manner prescribed by the Act of the 2d day of March, 1819, we do not entertain a doubt. A privilege thus conferred in no way conflicts with the provisions of any treaties made by the United States

with foreign powers, or with any Act or Acts of Congress relative to the free navigation of these waters. A ferry franchise is neither more nor less than a right conferred to land at a particular point, and receive toll for the transportation of passengers and property from that point across a stream. The exercise of such a franchise divests no right or privilege, which any citizen theretofore enjoyed freely and uninterruptedly to navigate the river. This right of free navigation can, by no manner of means, be construed as conferring upon the citizens the right to appropriate the banks or landings of this river to themselves, or to receive toll for transporting passengers and property from point to point across the same. It is absolutely necessary for the convenience and accommodation of the public, that this power should reside in, and be exercised by the State.

The Court are also of opinion, that the grant of a ferry franchise by the legislature of a State, unless limited by some general law, or some restrictive provision in the grant itself, is necessarily exclusive to the extent of the privilege thus conferred. This principle is so well established, that no authority need here be cited in its confirmation. Of all the numerous cases to which reference has been made upon the argument, not one has been produced which, in any respect, runs counter to it. It is a necessary implication from the grant itself. When a grant has once been made by legislative authority, to the extent of the rights conferred the power which made it is expended, and it cannot be taken back or transferred to another, until the public interests and welfare shall demand its resumption, and provision shall have been made for just compensation to the owner, in the manner required by law.

Under the then existing laws of this State, the grant to Wiggins was essentially a contract between him and the State. By the terms of it, on his part, he is bound to run the ferry to afford, at all times, a safe and speedy passage to travelers and their property across the river; to keep for this purpose a supply of boats and hands, and to propel such boats in the manner directed by the Act; and, on its part, the State contracts that he may run the ferry from lands

which may belong to him near the town of Illinois. The obligations imposed by the Act, and the power and ability to perform them, must, of necessity, be mutual.

The argument of the complainants' counsel, that if rival ferries are permitted to be set up within the limits of the complainants' grant, that they might thus occupy the whole extent of their landing place, and thereby compel them to violate their obligations, and forfeit their franchise, without any fault or negligence on their part, is, in our judgment, unanswerable in favor of this exclusive right of the complainants. It would be not only idle, but derogatory to the dignity of a sovereign State, to confer upon an individual privileges, impose duties to be performed, and penalties and forfeitures for their non-performance, and immediately turn round and interpose such obstacles as will utterly preclude the possibility of a compliance with the conditions thus interposed. Such a contract, however, is always subject to an implied reservation in favor of the sovereign power; that whenever the public good requires, or the exigencies of the State demand it, all the rights and privileges conferred may be resumed upon adequate compensation being made therefor. Such resumption, however exclusive may be the terms of the grant, violates no provision of the Constitution of the United States, or of the State of Illinois.

But the difficulty, if any exists, in the present case, is not so much in determining what are the general principles of law as applicable to the questions which arise, as to understand distinctly the nature, extent, and proper construction of the grant itself.

This is a public grant to private persons, chiefly designed by the the grantors for the benefit and accommodation of the public. The rule of construction of private grants, if the meaning of the words be doubtful, is, that they shall be taken most strongly against the grantor. An opposite rule prevails in cases of grants made by a sovereign power. Where there is doubt, the construction is made most favorably for the sovereign, and most strongly against the grantee. It is, however, to be understood that this rule holds only in cases

of real doubt. If the grant admits of two interpretations, one of which is more extended, and the other more restricted, so that a choice is fairly open, and either may be adopted without any violation of the apparent objects of the grant; if in such case, one interpretation would render the grant entirely inoperative and worthless, and the other would give it force and effect, the latter, if within the reasonable meaning of the terms employed, should be adopted. But public grants should not be extended, by implication, in favor of the grantee beyond the natural and obvious meaning of the words employed, even if by such construction the object of the grant is utterly defeated. This doctrine will be found to be fully recognized in the case of *The Charles River Bridge* v. *The Warren Bridge*, reported in 11 Peters, 420, where all the authorities on the subject are collected and reviewed. Let us test the provisions of the grant to Wiggins by these rules, and ascertain to what result we shall arrive.

The first section of the Act of the 2nd day of March, 1819, is in these words:

"That Samuel Wiggins, his heirs and assigns, be and they are hereby authorized to establish a ferry on the waters of the Mississippi, near the town of Illinois in this State, and to run the same from lands at the said place that may belong to him; *provided,* that he shall not use any boat or water craft, except such as shall be propelled or urged through the water by steam, horses, oxen, or other four footed animals; *provided,* also, that the said Samuel Wiggins, his heirs or assigns, shall have said ferry in actual operation within eighteen months from and after the passage of this Act."

These are the terms of the grant. The question is, to what extent they operate. Is it, or not, a reasonable interpretation of the words made use of, that at any period of time subsequent to the passage of the Act, Wiggins should be permitted to purchase any or all the lands near the town of Illinois, and exercise an exclusive right to run his ferry from the same, regardless of the growing importance of the State, and the increasing demands of the people for more extended accommodation. If such a construction is adopted,

Mills *et al. v.* The County of St. Clair *et al.*

what would be the limitation of his right? How near to the town of Illinois must his land be located? How far above and below should it be permitted to extend? May he not be allowed to occupy, as a ferry landing, the whole bank of the Mississippi opposite the city of St. Louis, extending several miles up and down the river, to the exclusion of other necessary ferries, and to the manifest inconvenience of the public, notwithstanding, at the time of the grant, he might have owned no land whatever upon the stream? Do the words made use of naturally or rationally import that, at any future period, Wiggins shall possess a perpetual right to purchase lands near the town of Illinois, and at his pleasure to make the same the terminus of his ferry? The ferry, by the terms of the grant, is to be established and in operation within eighteen months. If the grantee, by any construction of the law, could be allowed to purchase the land on which to locate it within that time, no good reason can be seen why afterwards he may not, at any period, purchase more adjoining, and so, from time to time, extend his landing until he shall occupy the whole bank of the Mississippi near the town of Illinois, the extent of which would of necessity be indefinite.

Wiggins, his heirs and assigns, are authorized to establish the ferry upon the Mississippi river near the town of Illinois, and to run the same from lands at that place that may belong to him. These words of the grant limit its operation to *"lands which may belong"* to Wiggins himself, and necessarily, by their terms, prohibit the running of the ferry from any lands which his heirs or assigns might subsequently acquire. It could only have been designed, that his heirs and assigns should succeed to the rights and interests acquired by him at the passage of the law, to run the ferry from his land and not from theirs. Had the legislature intended to extend this grant to other lands than those which were owned by Wiggins at the date of the Act; had they intended to bestow upon him the right to purchase, it is singular that they make no use of any words from which, by any reasonable intendment, these rights can be deduced. The authority to

establish the ferry is to Wiggins, his heirs and assigns. But it is to be established upon lands that may belong to *him;* not to him, his heirs or assigns. His heirs or assigns might have established the ferry, but where must this have been done? If Wiggins had died before the passage of the Act of the 6th of February, 1821, and before he had acquired the title to any land near the town of Illinois, could his heirs or assigns have purchased lands upon which this grant could have taken effect? In such case, the ferry could not have been set up upon lands which had belonged, or which might belong to him. The authority being to him, his heirs and assigns, and the place or location appointed upon *"lands that may belong to him"* only, make it most apparent to the Court, that the grant by any proper and rational construction could only operate upon lands which Wiggins owned at the time of the passage of the law conferring it. Any other interpretation, it seems to us, would be absurd, and lead to dangerous and alarming consequences.

It is no where said in this Act, that the ferry may be established upon lands which might at that time belong to his heirs or assigns, and yet they are permitted to establish it *"upon lands which may belong to him."* If he might purchase lands for this purpose after the grant, why are his heirs and assigns prohibited from doing the same, if it was designed that the grant should operate upon lands other than those owned by him at the time it was made? Suppose at this time Wiggins had been the owner of land near the town of Illinois, extending one mile up and down the river, and within a short period of time, say within eighteen months thereafter, he had purchased one mile more adjoining the same. What, according to the principles of construction before laid down, would have been the extent of his grant? If he had owned land at the time, could he have purchased more, and *in* this manner have extended his franchise co-extensive with his title, and claimed the exclusive right, which is given him by the second section of the Act, to prohibit the establishment of any other ferry within one mile of his limits thus defined? If such a state of facts would not present a clear

case against him, it could hardly be questioned that the extent of his grant would rest in doubt. In such case, the more extended or more restricted construction would not defeat the object of the grant, and the rule undoubtedly would be, to adopt the less extended one which would operate most beneficially in favor of the grantor.

It is evident from the second section of this Act of 1819, that the legislature intended that Wiggins should have an exclusive right for one mile on each side of the ferry to be by him established, until the public good demanded a repeal of so much of this section as conferred it, of which they reserved to themselves the right to judge. This was part and parcel of the contract, a reservation in favor of the State; a right, which by the repeal of so much of that section as prohibited the establishment of other ferries within one mile of Wiggins' ferry, on the 19th day of January, 1833, the State resumed. But this reservation would have been of little moment, if, within the eighteen months allowed to Wiggins to put his ferry in operation, or afterwards, he could have purchased all the lands upon the bank of the river near the town of Illinois, converted the whole into a ferry landing, and thus extended his privilege so as totally to defeat the object of the legislature in the repeal of this portion of the law.

The terms "land which may belong to him," as used and applied by the law makers in this Act, by a proper and rational construction under the rule as before adopted, in our judgment, mean neither more nor less than "lands belonging to him" in the present tense. The Legislature evidently acted upon the presumption, that he was the owner of some land at the place where he designed to establish his ferry, suitable for that purpose. The time allowed him to put his ferry in operation was not given to afford him opportunity to acquire land upon which the grant could take effect, but to allow him a reasonable time to make the necessary preparation to build his boats, erect his wharves, and provide himself with the necessary materials for successful operations.

Had it been the intention of the Act, or those who made

it, that he should run his ferry from lands which he might afterwards acquire, it would have been easy and natural that it should have been so expressed; and even in that case, this acquisition must have been made within the period of eighteen months, because within that time the ferry must have been in operation; and by no construction of the law could it have been located upon any, except his own land. When once located, it could not be removed without the consent of the grantor of the right. Not that the privilege must be confined to the precise spot of ground upon which the first landing was effected; that it must be limited to that particular terminus upon which the grant, at the time it is made, must operate, is most apparent. If, at this period, Wiggins had been the owner of several distinct and detached parcels of land upon the Mississippi, near the place contemplated by the law; for instance, one above and one below the town of Illinois equally distant from the same, and had established his ferry upon, and run his boats from the one tract, could it be contended that he might afterwards, and upon his own motion, by virtue of any right derived to him through the grant, remove the same upon the other tract, and thus, although other lands of more than one mile in extent might intervene, prevent the establishment of another ferry within one mile of his tracts? Or, if the land upon which his ferry had been established had been entirely swept away by the waters of the river, was this grant designed to operate forever prospectively in favor of the grantee and his successors, to authorize them to run a ferry from any land which they may still acquire? Does the whole eastern bank of the Mississippi river opposite the city of St. Louis, for ferry purposes, belong to these complainants, their heirs and assigns forever? The legislature must confer this right in language more clear and unequivocal before this Court can intend it.

Authorities are not wanting to prove, that when a party has his option to set up his franchise at one place or another, with an exclusive right within a given distance of either, and he elects his situation, he cannot afterwards remove the same, although his privilege has been destroyed without

fault or negligence on his part, to the other place where he might have chosen his location, and then claim the exclusion to which he might, had he so elected, have been entitled from the latter place. The case of *The Cayuga Bridge Company* v. *Magee*, reported in 8th Wendell, is in point, and if, as we doubt not, the principles there settled are sound law, has a material bearing upon the question here involved. The State of New York, by Act of their legislature, granted to the complainants in that suit a charter empowering them to build a bridge over the Cayuga lake or outlet, at their option, without any designation of the place. The Act also prohibited any other person from erecting any other bridge within three miles of the one established by the company. They built their bridge across the lake; it remained for some years, and was swept off by the ice. Under the impression that their grant was still in force, and operative for their benefit, and that their right of selection as to location still remained, they constructed a second bridge two miles north of the former one, and subsequently under another grant amendatory to the first, which conferred upon them all the privileges enjoyed by them under the original charter, they built a new bridge on the site of the old one, which had been carried off by the ice, and under this state of facts contended that they had exclusive right extending three miles from each of their bridges thus erected. The Court held, that having once made their location, the power of the grant was spent; that their right was no longer ambulatory, and intimated that it followed, as a consequence, that after their first bridge was destroyed, the company had no longer the right to rebuild it at any other place than the one first selected; and held distinctly, that if that right did exist, still their exclusive privilege could extend only three miles from the site of the first bridge erected. One of the Senators, in his opinion says: "The prohibition attached to the place where the bridge was built, and not to the bridge itself. They surely did not move that place by moving the location or site of the bridge, and unless they did, the exclusive limits must remain the same in extent and situation as they were before the construction of the second bridge."

So we hold in the present case, when the complainants here, or those under whom they claim, had once set up their franchise, they were bound by their location, and that, in no event, could their limits or exclusive right extend beyond the lands they owned at the time of such location, and one mile on each side thereof. Forasmuch, then, as it appears by the complainants' bill in this cause, that at the time of the passage of the Act of 1819 before referred to, neither the complainants nor their grantors owned any land upon the Mississippi near the town of Illinois, upon which the grant could operate, the Court are of opinion, that had it not been for the supplemental Act of the 6th day of February, 1821, the complainants could not exercise any exclusive rights of ferriage at the place before referred to. The fact that Wiggins himself applied to the legislature at this time for leave to remove his ferry upon any lands which might belong to him, although by no means conclusive, furnishes some evidence that his understanding of the contract was, that his franchise was not of an ambulatory character. The preamble of that Act recites, as a reason for such removal, that "since the establishment of the ferry a sand bar had formed opposite to said ferry." This preamble properly comes in to aid us in giving construction to this, as well as the former Act, with reference to the location of the franchise. It is an admission, that at this time the ferry was established at a certain place, and that a sand bar had been formed opposite thereto; and he, his heirs, and assigns seek the permission of the legislature to remove it "upon other lands which may belong to him or them." This was granted under the same privileges prescribed by the former Act, and Wiggins, his heirs, and assigns are authorized to remove the ferry upon any lands near the town of Illinois which may belong to him or them.

The difference in the language here employed, and that made use of in the former Act, does not, except so far as change in the location is concerned, materially change the nature of the grantee's rights. He, his heirs, or assigns must be allowed a reasonable time after the passage of the law to remove the ferry upon other lands, which he, or his assigns might then own, or his heirs might, in the contingency of his

death, through him inherit before the reasonable time for such removal had transpired. We must either give the Act this construction, or determine that the complainants' rights are without limit, and their franchise boundless both in extent and time. This we must doubt at least, and such a doubt, if well founded, determines the question in favor of the grantor, the sovereign power.

At the period of time last alluded to, Wiggins had sufficient title to the Piggott tract of one hundred acres, claim numbered 624, upon which the grant could operate, and the Act gave him the exclusive right to a ferry from that tract, and until the repeal of the second section of the Act of 1819, a like exclusive right to one mile on each side thereof.

From a careful investigation of the whole subject, a due and proper consideration of the grant, and the rules of construction applicable to the same, we are constrained to hold, that his and his successors' rights are bounded and limited here; that this land constitutes his terminus, the boundary which circumscribes his franchise, and that, if other lands subsequently acquired by him or them, have become necessary to the full and free enjoyment of the same, he or they must resort to the legislature, and not to the Courts of Justice for an extension of the limits of the same. The defendants' ferry is not located upon this tract. It does not interfere with the contract between the State, and the complainants or their grantors. It may subtract from the tolls and profits which complainants would otherwise receive and enjoy, even to such an extent as to render their franchise entirely valueless, but does not violate or impair the obligation of the contract. Suppose that the terminus of this ferry of the complainants had been specifically defined by metes and bounds, and put into successful and profitable operation, would any one doubt the right or power of the legislature to charter a company to build a bridge immediately adjoining the complainants' landing place, upon their land, on making adequate compensation for the land alone, which, by the superior facilities it would afford, would totally destroy the value of the ferry? In all grants or contracts of this sort,

made or entered into by a sovereign power, this right is a necessary reservation, and the grantee enters into the contract with this implied restriction and limitation. Although his profits may be diminished, his legal rights are not impaired. It is no more to be implied from such a grant, that others of a similar character will not be made, which may indirectly interfere with the profits of the first, than it is to be inferred, when the United States grant a tract of land on the Mississippi river to one who purchased with a view of furnishing steamboat fuel from the same, that no other grant of land in the same vicinity should be made, whereby the second purchaser might interfere with the intended speculation or business of the first. In such case, like the present, the first grantee might be materially injured, but it would be an injury without remedy.

It is contended by the complainants' counsel, that the Act of the Legislature of this State of the 2d of March, 1839, is repugnant to the first clause of the tenth section of the first article of the Constitution of the United States, which prohibits the States from passing any laws impairing the obligation of contracts; and also to the eleventh section of the eighth article of the Constitution of this State, which provides that "no man's property shall be taken or applied to public use without the consent of his representatives in the General Assembly, nor without just compensation being made him." We have already seen that the establishment of defendants' ferry, either with or without the Act of the Legislature of this State authorizing the same, does not impair the obligation of any contract between the State and these complainants. It remains to be determined, whether any of the provisions of the Act before referred to are opposed to the provisions of the Constitution of this State above recited; and if, in any respect, they should be found to be in conflict therewith, either in terms, or in the use to which they have been applied, the complainants have sought their appropriate remedy against their operation. By this Act certain persons are appointed commissioners to locate a road and ferry landing between Cahokia creek and the Mississippi river, three

hundred feet in width on the most eligible ground for that purpose. They are to report the same, when located, to the clerk of the County Commissioners' Court of St. Clair county, and the same, when so located, is to be and remain a public highway forever. The land is to be condemned and the amount of damages paid to the owner out of the funds of the county of St. Clair, and after the damages are paid, the County Commissioners' Court, by their agent or otherwise, are authorized to enter upon the same and establish their ferry across the Mississippi river; to carry on the ferry themselves, or to lease it for a period not exceeding five years at a time. The Act further provides, that these damages shall be ascertained by a jury of disinterested men, to be summoned by the sheriff of the county of St. Clair, and for an appeal from their verdict, in case either party shall be dissatisfied therewith, to the Circuit Court of the said county.

This is the substance of the Act.. It directs private property to be taken for a public use, and not a private one. It is only the exercise of such power as the legislature of all the States of this Union have heretofore assumed the right to exercise, whenever, in their opinion, the public good requires it. It authorizes the location of a road and ferry landing, not at any particular, but at the most-eligible point, in the discretion of the Commissioners appointed to select the same. It provides a just compensation for the payment of such damages as the owner may sustain, and makes the payment of those damages a condition precedent to the right to occupy the same by the defendants. The place selected, as has before been shown, did not interfere with the terminus of the complainants' ferry, and consequently they can have no damages on account of deduction from their tolls, or other merely consequential injury. The damages were assessed and paid, or what is equivalent thereto, were tendered on the nineteenth day of July, 1842; and it no where appears from the complainants' bill, that the defendants entered upon the land previous to the time of the tender of the money due for the damages so assessed. In fact, the lease to Harrison, which is referred to and made an exhibit in the bill, and which bears

date on the sixteenth day of January, 1844, tends strongly to prove that possession was not taken of the road and ferry landing until this time, which was long after the money for the damages had been tendered by the defendants.

It is intimated, if not directly averred, in the complainants' bill, that the public convenience does not require at this place three hundred feet in width for a road, and that the soil, which the same passes over, is appropriated to private and not to public purposes. This certainly, if true, could not make the law itself unconstitutional. Whether private property, and if so, how much shall be taken for the public use, is a matter which, of necessity, must rest in the discretion of the legislature. To determine these questions, it is the sovereign power. No appeal from or review of its judgment can be had. The power may be sometimes injuriously or oppressively exercised, but this can be no argument against its existence. So long as the legislature confines itself within the limits of the Constitution, and provides a just compensation for private property which is deemed essential to the public use, the party whose property is taken is remediless, unless he can convince them that justice and good faith should induce them to retrace their steps.

Could the idea be for a moment entertained, that if the legislature should provide by law that a certain public road should be laid out and opened six rods wide, that a Court of Equity could interfere in favor of the owner of the land over which it passed, because it might be alleged that four rods in width was amply sufficient for public benefit and accommodations? The charge in the bill, that the defendants are appropriating the land over which this road passes, to their private purposes—if for the purposes of this the Court could notice it—is of too vague and uncertain a character on which to found a decree for their relief. The soil, the freehold is still theirs. The defendants can only use it for a road and ferry landing. For aught that appears to the Court, the complainants have an adequate remedy at law for any improper use to which it may be appropriated.

On account of the importance of the questions, and the

magnitude 'of the interests involved, the Court have exa-
mined this case with much care.   We have endeavored to
gather the intention of the legislature from the words of the
enactments.   We have deemed it the only rule which we
could safely and legally adopt in their interpretation.   We
have not felt ourselves at liberty to trace back to the period
of time when these events occurred, and make use of our
own, or others' knowledge of facts and circumstances co-
temporary with the grant, and thus attempt to determine, by
matters not in the record or the law, what was the real inten-
tion of the legislature,  contrary to the spirit and meaning of
the language employed by them.   We have endeavored not
to make the law, but to decide it as it is; and although hasty
and inconsiderate legislation may sometimes render it diffi-
cult to ascertain the true interpretation of the whole of a
particular Act, yet, if, in construing public grants, we adhere
to the sound  principles recognized by the most approved
authorities, that in doubtful cases the words are to be taken
and understood as operating most strongly against the
grantee, and in favor of the public, we shall seldom do injus-
tice to the people, or the parties litigant.

The Court are of opinion, that in the decree of the Circuit
Court dissolving the injunction and dismissing the complain-
ants' bill, there is no error.  The decree is, therefore, affirmed
with costs.

*Decree affirmed.*

After the foregoing Opinion was delivered, *D. J. Baker*,
counsel for the appellants, moved the Court to grant a cer-
tificate that the validity of a statute of this State was drawn
in question, specifying the same, on the ground of its repug-
nancy to the Constitution of the United States, and that the
decision of the Court was in favor of the validity of such
statute.

*L. Trumbull*, and *J. Gillespie*, for the appellees, resisted
the motion, and submitted the following views:

"The counsel for the said appellees object to the granting

of a certificate in this case as prayed for by the said complainants, and assign as a reason, that the Supreme Court of the United States has no jurisdiction hereof, and defendants say, that in order to invest the said Supreme Court of the United States with jurisdiction in a case, wherein has been drawn in question in the State Court the validity of an Act of the legislature of a State on account of its repugnancy to the Constitution of the United States, and the decision of the State Court has been in favor of the validity of such Act, the validity or invalidity must have been the principal or material question in the case, and one in which, if the State Court did not affirm the validity of the Act of the legislature, the decision would not have been as it was. In support of these views, we refer to Conklin's Treatise, 22; 10 Peters, 368; 12 do. 66; 13 do. 157; 15 do. 18.

"In this case, we insist that the question whether the Act of the legislature of 1839 was valid or not, was purely immaterial. The material points and questions decided in this case were, first, that Wiggins not having title to any land opposite the city of St. Louis at the date of the passage of the Act of 1819, had nothing upon which his grant could operate, and consequently that he acquired no rights under that Act; but that having acquired title to the Piggott tract at the date of the Act of 1821, the grant of the ferry franchise under that Act was a contract which would not be directly or indirectly impaired, affirming in part what the appellants insisted upon; that the appellees not having established or attempted to establish a ferry upon any land owned by Wiggins at the date of the passage of the Act of 1821, and upon or from which only he could pretend to have an exclusive right to ferry, they have not interfered with his rights. The only material proposition then before the Court, which was decided against appellants, was the question of what title Wiggins had at the date of the Acts of 1819 and 1821, respectively. The other material question in the case was, whether the grant of the ferry franchise, under the Act of 1819 or 1821, was or was not a contract, and could or could not be impaired, and was decided in favor of appellants, in terms as strong as they

insisted upon themselves. If the decision would justify the conclusion, that neither Wiggins or his assigns had any exclusive right to ferry from the Codaire tract, it follows that the Act of 1839 was not necessary to authorize the appellees to establish their ferry. They might have established it without any legislative sanction, and if this conclusion is correct, then there was no affirmance or disaffirmance of the validity of the Act of 1839, in respect to its impairing the obligation of a contract; or if there was an affirmance of its validity, that decision was entirely immaterial if the appellees could have done without its sanction, what they are obliged to have done under it."

The Court directed the following order to be entered upon the records:

It is *ordered* by the Court, that it be certified in this case, that there was drawn in question the validity of the statute of the State of Illinois, entitled "*An Act to authorize St. Clair county to establish a ferry across the Mississippi river*," approved March 2, 1839, on the ground that it was repugnant to the Constitution of the United States, and that the decision of the Court was in favor of the validity of said statute.