WAUKEAG FERRY ASSOCIATION, PETR.

*vs.*

MILTON S. AREY ET ALS, COUNTY COMMISSIONERS.

Hancock.     Opinion April 11, 1929.

*Ryder & Simpson,*
*Wood & Shaw,* for petitioner.
*W. B. Blaisdell,* for Bridge District.
*Raymond Fellows,* Atty. General, for State Highway Commission.
*H. L. Graham,*
*D. E. Hurley,* for County Commissioners.

SITTING: WILSON, C. J., PHILBROOK, DUNN, BARNES, BASSETT, PATTANGALL, JJ.

BASSETT, J. This is a petition to the Supreme Judicial Court under the provisions of R. S., Chap. 82, Sec. 3, which confers upon the court the power of general superintendence of all inferior courts for the prevention and correction of errors and abuses where the law does not expressly provide a remedy. It was brought to revise and correct the proceedings of the county commissioners of Hancock County in determining the damages suffered by the petitioner by reason of the construction of the Hancock-Sullivan Bridge. The case comes by agreement before this court on report upon the petition, answer and replication, a copy of the original petition of the plaintiff to the county commissioners, notice thereon and the report of county commissioners to the State Treasurer.

From this record and two special acts of the legislature in 1919 and 1921, the following appears:

Chap. 92 of the Private and Special Laws of 1919 authorized by its first section Bradbury Smith and his assigns "to establish and maintain a ferry for the space of ten years from and after February fifteenth, nineteen hundred and twenty-one between the towns of Sullivan and Hancock . . . across Taunton Bay, or Sullivan River, so called, from the terminus of the road now existing on the Hancock shore" with the right to keep and maintain the necessary boats, landings and other property to operate the ferry. The act established rates of toll, and provided that no other ferry should be operated "within three fourths of a statute mile above or below the ferry established by this act."

Section 6 of the act provided that the county commissioners should have supervision of all matters pertaining to all apparatus used in operating the ferry and its service, and upon petition and hearing might order the same to be improved and, if the order were not complied with to their satisfaction, should so determine and decree and in such case all the powers, rights and privileges granted by the act should terminate and the commissioners should appraise the boats, apparatus and other property used in operating the ferry at its fair value, and the powers, rights and privileges granted by the act should inure to and become vested in such person or persons and their assigns as the commissioners should appoint, provided such appointee or appointees paid the amount of the appraisal within the time specified by the commissioners. The section

further provided "Said commissioners shall also have the power, at any time, during the continuance of this charter, after petition and hearing when in their judgment the public interest demands it to revoke all the powers and privileges granted by this act, and thereupon they shall appraise all the boats, apparatus, and all other property . . . used in . . . operating said ferry at its fair value and any person who may be appointed to run said ferry under the statutes of Maine shall purchase said property as (at) said appraisal; provided, however, that if the said Smith or his assigns shall, within a reasonable time, be able to dispose of said property at an advance over the value as appraised by the county commissioners, he or his assigns shall have the authority and right to do so."

Smith established the ferry and maintained and operated it from February 15, 1921, until May 1, 1924, when he lawfully assigned it, the franchise, boats and entire equipment to the petitioner.

By Chap. 120 of the Private and Special Laws of 1921, the towns of Hancock, Sullivan, Sorrento, Gouldsboro and Winter Harbor were incorporated as a "public municipal corporation under the name of the Hancock-Sullivan Bridge District for the purpose of taking advantage of the provisions of chapter three hundred and nineteen of the public laws of nineteen hundred and fifteen," (the "Bridge Law" so called) and of acts amendatory thereto by applying through its board of trustees "for the construction of a bridge between the towns of Sullivan and Hancock . . . across Taunton Bay or Sullivan River, so called, from the terminus of the Waukeag Ferry road now existing, on the Hancock shore."

Section 6 of the act provided as follows:

"Sec. 6. Damages to be paid owners of Waukeag Ferry; how adjusted. The county commissioners of Hancock County are hereby authorized to determine on petition therefor by said trustees or by the owner or owners of Waukeag Ferry, so called, after notice and hearing, the damages suffered by said owner or owners by reason of the construction of said bridge. When said damages are so ascertained the said county commissioners shall certify the same to the state treasurer who

shall forthwith pay the amount thereof to the said owner or owners from the joint construction fund."

Pursuant to this act, a free bridge was constructed in the designated location, completed and opened for public travel May 17, 1926, with the result that the travel by ferry was entirely diverted to and across the bridge and the ferry business of the petitioner wholly destroyed.

In accordance with Section 6 of the act, the petitioner on May 14, 1926, petitioned the county commissioners to determine the damages suffered by it by reason of the construction of the bridge. Notice of hearing was duly given, and the hearing held on June 19, 1926.

At the hearing the petitioner claimed that the county commissioners in determining the amount of damages suffered must consider the diminished value of the boats and equipment which were left useless by the construction of the bridge, and the loss of prospective profits from tolls and revenues from May, 1926, when the bridge was opened to the public, with consequent complete and permanent destruction of the ferry business to February 15, 1931, when the right to operate the ferry would expire. Evidence was introduced in proof of these claims.

The commissioners ruled as a matter of law that the petitioner had not suffered any damage within the intent of Chapter 120 by being deprived of tolls and revenues and was not entitled to compensation for loss of prospective profits.

They determined that the damages suffered were to six boats amounting to $3,200, and so certified to the state treasurer July 13, 1926.

To correct their ruling and determination, this petition was brought May 16, 1927.

The final question to be determined is the meaning of the words "the damages suffered by said owner or owners by reason of the construction of said bridge" in Sec. 6 of Chap. 120 of the Laws of 1921, which may be referred to as the bridge act. The legislature had obviously in mind that the owner of the ferry would suffer damages by the construction of the bridge and expressly provided for their determination and payment. The question presented is therefore not the same as in those cases where the owner of

the ferry sought to recover damages by reason of the construction of a bridge when there was nothing in the statute law, under which the bridge company derived its right to erect and operate the rival bridge, which indicated that the legislature intended to grant it the authority so to do but with liability for damages.

Prior questions for determination are, what were the rights of the petitioner under Chap. 92 of the Laws of 1919 which may be referred to as the ferry act, and, how were those rights affected by the construction of the bridge?

All ferries in this state are governed by statute either by special act of the legislature or by the general statute regulating the establishment, licensing and control of ferries by county commissioners, which may be referred to as the general ferry statute and under which the licenses granted are revocable at the pleasure of the county commissioners. Common law rights of ferries are not involved here and the general statute does not apply, except so far as considered below. *Ferry Co.* v. *Casco Bay Lines,* 121 Me., 111.

The petitioner's ferry was established by special act of the legislature and we must examine that act to ascertain the scope and limits of its rights and powers.

The petitioner claims, and that is the foundation upon which all its contentions rest, that the ferry act granted an exclusive right or franchise to maintain a ferry between the towns of Hancock and Sullivan as located and for a distance of three-quarters of a mile above and below that point until February 15, 1931.

The grant of a ferry franchise by the legislature of a state, unless limited by some general law or some restrictive provision in the grant itself, is necessarily exclusive to the extent of the privilege thus conferred. *Mills* v. *County of St. Clair,* 7 Ill., 197.

Section 1 of the ferry act, taken by itself, granted an exclusive ferry franchise for a term of ten years, Lewis on Em. Dom. (3rd Ed.), Sec. 214. But Section 6 provided for revocation during the continuance of the charter, not, as was contended by the county commissioners, at any time *or* when in their judgment the public interest required but "at any time . . . when in their judgment the public interest demands it" and then only "after petition and hearing." In such case the commissioners had not the right, as contended by the county commissioners, but "the power . . . to re-

voke." And the public interest which determined revocation was not public interest generally but interest that the ferry should be run properly. The county commissioners were under the duty of appointing someone to run the ferry, whether they determined their orders for proper improvement of service had not been complied with or that public interest demanded a revocation of the franchise of Smith or his assigns. In the former case, the franchise by the act inured to and became vested in the appointee. In the latter, the franchise was terminated and a license would be granted to an appointee under the general statute. In either case, the boats and other property of Smith or his assigns must be appraised and the appointee must take them at appraisal. The ferry would continue to run.

The commissioners contended that Section 6 modified Section 1 and the two sections taken together negatived any claim to vested rights for the full space of ten years and that the owners of the ferry held it from day to day subject to revocation at any time or when public interest required.

We think the two sections must be taken together and the exclusiveness of the first section was modified by the second, but only to this extent. The franchise was at the outset an exclusive vested right to operate a ferry and so continued unless and until the power of revocation for the purposes above stated was exercised. The county commissioners could not revoke at their discretion or in any arbitrary way but only upon and after legal procedure, petition, hearing and determination. The question of revocation must be raised by direct proceedings therefor. It could not be raised collaterally in the proceedings to determine damages under Section 6 of the bridge act. 12 Enc. of Law, 1104, 1115; *Coombs v. Sewell*, 59 S. W., 526 (Ky. Appl.); *Lamar v. Commissioners' Court*, 21 Ala., 772; *New York v. Starin*, 12 N. E., 631 (N. Y.); *Billings v. Breinig*, 7 N. W., 722 (Mich.); *Menzel Estate Co. v. City of Redding*, 174 Pac., 48 (Cal.).

There was no claim or suggestion that the petitioner, up to the time the operation of the ferry stopped, had been guilty of any negligence or misconduct such as would justify the revoking of its franchise and the appointing by the commissioners of another to run the ferry, and no proceedings to revoke the powers and privi-

leges of the ferry act have been instituted. So far as any revocation is concerned, the petitioner still owns the franchise, which is still an exclusive ferry franchise, and since it is reasonably certain that no proceedings will be brought to revoke the petitioner's franchise in order to license another ferry, which it would not pay to maintain or to operate, the petitioner will continue to own the franchise until February 15, 1931.

The petitioner claims that its rights and franchise were impaired by the construction of the bridge.

It is settled that the property with which the franchise of a ferry is made available and the franchise itself are private property subject like all other property to the power of eminent domain, but within the constitutional inhibition against such taking without just compensation. Lewis on Em. Dom., Secs. 213, 215.

It is also settled that the franchise is a contract between the state and the grantee binding upon both, the obligation of which can not be impaired by the legislature and any subsequent act so doing is void. Lewis on Em. Dom., *supra*; *Rockland Water Co.* v. *Camden and Rockland Water Co.*, 80 Me., 544, 561; *Propr's Machias Boom* v. *Sullivan*, 85 Me., 345; *Mills* v. *County of St. Clair*, supra.

The franchise to the extent of the rights granted is thus protected, and the extent of the grant depends upon its construction.

The rule universally·applied to such construction is that the grant will be strictly construed in favor of the sovereign and against the grantee and such grant will not be deemed exclusive unless expressly so stated in the grant itself or such conclusion arises by necessary implication from the express language of the grant. Lewis on Em. Dom., Sec. 214; *Snidow* v. *Board of Supervisors*, 96 S. E., 810 (Va.); *Larson* v. *South Dakota*, U. S. Sup. Court, Oct. Term, 1928.

The petitioner contends that a free bridge can not be erected within the limits of an exclusive ferry franchise without violation of the rights of the ferry.

It claims that this was so settled in Massachusetts as early as 1798 by *Chadwick* v. *Proprietors of Haverhill Bridge*, 2 Dane's Abridgment, 686, and that in *Pierce* v. *Bangor*, 105 Me., 413, 425, our court decided that the common law of Massachusetts is the law of the land which controls the interpretation of our constitution.

*Chadwick* v. *Proprietors of Haverhill Bridge* was considered by the Justices of the Massachusetts Court in the famous case of *Charles River Bridge* v. *Warren Bridge*, 7 Pick., 344. Chadwick, the owner of an admittedly ancient ferry, brought an action of case for building a bridge within forty rods of the ferry. Upon his representation to the legislature, provision was made for his indemnity by commissioners. He preferred an action at law which was submitted to reference, Mr. Dane being chairman of the referees, and an indemnity was awarded him. In *Charles River Bridge* v. *Warren Bridge*, Chief Justice Parker said (p. 516), "There was no decision of the Court but it may be inferred that the action was considered as rightly brought. As that is the only case to be found on our judicial records, it is unfortunate there was no decision of principles. All we can know is, that by the erection of the bridge the ferry was entirely destroyed, and that upon such question it was intimated by the court that a party so situated had a right to his trial by jury. . . . At most the case is authority only for a decision, that if a bridge be built by license of the legislature within forty rods of an ancient ferry over the same river, the proprietor of the latter is entitled to indemnity."

Justice Putnam said (p. 485), "I consider this to be a case of great importance, notwithstanding the judgment was rendered upon a report of referees. . . . It may not under the circumstances be considered as *binding* upon the court. But if it is considered merely as the award of the American Coke upon a question of legal right, it is to be treated with great respect."

Justice Wilde (p. 472) said, "But this case was not decided by the court but by referees and it does not appear that any objection was made to their report. And besides, provision was made in the defendant's charter for compensation to the owner of the ferry, so that the only questions in that case were as to the amount of compensation and by whom it should be ascertained."

In the decision of *Charles River Bridge* v. *Warren Bridge* in the Supreme Court of the United States, 11 Pet., 496, Justice McLean said (p. 568) of *Chadwick* v. *Proprietors of Haverhill Bridge*, "This award was sanctioned by the Court. Under the circumstances of this case, at least as great a weight of authority belongs to it, as if the decision had been made on the points involved."

Justice Story said (p. 647), that he considered the case of the very highest authority "notwithstanding all I have heard to the contrary."

But our own court considered the Chadwick case in *Day* v. *Stetson*, 8 Me., 365 (1832), where the plaintiff, claiming to be the owner of an ancient ferry, brought an action of case for setting up a horse ferry at the same place. The Court, holding that all ferries in Massachusetts and Maine "except such as were stated and settled as early as 1695" depend upon the general law and that the plaintiff's ferry so depended, said of the Chadwick case (p. 368), "The action was referred. The referees awarded in favor of the plaintiff and their report was accepted by the Supreme Judicial Court. From this and another action of the same character, Mr. Dane deduces that some ferries in Massachusetts are considered as private property, and as estates in fee and not as appendant to any corporeal estate. Whether this opinion is well founded in law would depend on facts, which we have no means of investigating and which we are not called upon to decide. We are not advised of any ferries of this description in Maine and it may be doubted whether any such exist here. It is very manifest that the ferry in question (the instant case) is not of this character. . . . (p. 370). We have examined the acts authorizing the erection of bridges in Massachusetts and Maine. In very few instances has provision been made for compensation to the persons receiving the emoluments of the ferry. Whether in any case without such provision anything could be recovered at law of the bridge corporation might admit of great question. Where the ferry was private property holden in fee as appears to have been the fact in the case cited by Mr. Dane, perhaps it might; although that was one of the few cases, where the act of incorporation required satisfaction to be made to the owner of the ferry. There may be cases where such provision for a licensed ferryman (under the general law) may be equitable, which if seen and understood by the legislature, would probably always be enjoined by the legislature. But it would be a condition imposed not upon but by them; not arising from a limitation of their power but depending upon the exercise of their discretion."

It appears that the Justices of the Massachusetts court did not

agree as to what the Chadwick case was an authoritative decision of. Our Court was of the opinion, as was Chief Justice Parker, that it was a decision upon an ancient ferry of which there was none in Maine. The case can not be said therefore to have settled for Maine courts the broad principle, for which the petitioner contends, in its favor.

Nor is that principle supported by the weight of authority in the cases, which are conflicting.

The question is whether a grant of a ferry franchise, exclusive within stated limits, should be construed as a grant of transportation by ferry only or as covering all methods of travel and transportation across such water.

A general discussion of the law is found in 11 R. C. L., 925, Sec. 15; 59 L. R. A., 541, 548; 12 Am. & Eng. Cas., 255.

The latest decision is *Larson* v. *South Dakota*, supra. The Supreme Court of South Dakota had held that the fair and reasonable construction of a statute, providing for ferry leases and that no other lease should be granted within four miles from the ferry landing across the same stream, was that it referred "solely to transportation by ferry" and that "nowhere in the statute can be found or implied a provision that the state was binding itself not to construct, nor authorize the construction of, a bridge across the river, within the four mile area or not to permit carriage by aviation across it." On appeal to the United States Supreme Court, it was held in an opinion by Chief Justice Taft, which cites fully the authorities and carefully distinguishes them, that the judgment of the Supreme Court of South Dakota be affirmed. The opinion says, "We can hardly say, therefore, from the weight of authority, that an exclusive grant of a ferry franchise, without more, would prevent a legislature from granting the right to build a bridge near the ferry. Following the cases of this Court in its limited and careful construction of public grants, it is manifest that we must reach in this case the same conclusion."

But it is not necessary to decide whether the legislature could grant the right to build this bridge without providing for compensation because it expressly did provide for compensation for damages suffered.

The petitioner claimed that the bridge was constructed upon the ferry site and that the western termini of the bridge and ferry were identical. But the record is not clear upon this point. The western point of the ferry was "the terminus of the road now existing on the Hancock shore"; of the bridge "the terminus of the Waukeag Ferry road now existing on the Hancock shore."

It does not appear, however, whether or not the bridge was built upon and occupied the site of the ferry. The ferry obviously continued to run during the construction of the bridge and until it was opened to public travel. The diversion of traffic to the free bridge, not its physical obstruction, appears to have been the cause of the ferry's ceasing to operate. Nor does it appear that any property of the petitioner was directly taken or that the bridge was a physical obstruction to the exercise of the ferry franchise, its approaches, landings or navigation. If the locus occupied by the petitioner for its ferry had been taken in whole or in part and it was not left to the enjoyment of an exclusive right of ferry as before by the construction of the bridge, there would have been a taking of its franchise. *Mason* v. *Harpers Ferry Bridge Co.*, 17 W. Va., 396, 419; *Piscataqua Bridge* v. *N. H. Bridge*, 7 N. H., 35, 59; *Snidow* v. *Board of Supervisors*, supra. Provision in the bridge act for just compensation would then have been the duty of the legislature and must have been intended.

On the other hand, if there was no such direct taking and the petitioner still had the right to use its ferry and solicit and obtain all the patronage it could and was not prevented from using its ferry as before, the legislature had the right to provide payment for damages suffered indirectly and consequentially by the construction of the bridge, whether it considered that it could not on the doctrine of some of the authorities legally authorize the construction of the bridge without providing for the payment of damages or that on the doctrine of other authorities it could so authorize, but nevertheless made provision "equitable, which, if seen and understood, would probably always be enjoined by the legislature." *Day* v. *Stetson*, supra, 370.

"It was quite competent for the legislature, in providing for the prosecution of a great public work to require compensation to be made to persons injuriously affected by it though not a case coming

within the express requisitions of the bill of rights." *Dodge* v. *Co. Comm'rs*, 3 Met., 380.

The "damages suffered by reason of the construction of the bridge" are those resulting from the natural and necessary consequences of the erection and of the use of the bridge. If the petitioner was left with the boats and the right of ferrying across the river such passengers as chose to go and take toll for the service thus rendered, the opportunity afforded to the public of evading the use of the ferry of necessity not only injuriously affected but practically entirely destroyed the value of the franchise of the ferry. *Columbia Delaware Bridge Co.* v. *Geisse*, 35 N. J. L., 558; *Queen* v. *Cambrian Ry. Co.*, L. R., 6 Q. B., 422.

The franchise was the right to take tolls. Evidence of such value must be considered, Lewis on Em. Dom., Sec. 721, and would be shown by proof of the income, revenue, and earnings derived by the petitioner from the ferry for several years preceding the opening of the bridge. *Columbia Delaware Co.* v. *Geisse*, 38 N. J. L., 39, 43; *Montgomery County* v. *Schuylkill Bridge Co.*, 20 Atl., 407 (Pa.). And while it is proper in estimating the value of a franchise to consider that it is subject to a forfeiture, when such is the fact, *Westchester etc. Plank Road Co.* v. *County of Chester*, 37 Atl., 905 (Pa.), we do not think, for the reasons above stated, that the franchise could reasonably be held to be subject to what was practically forfeiture on the part of the petitioner, either by the franchise being divested from the petitioner and vested in another or by its being revoked for the purpose of licensing another. The franchise was therefore a right to continue to take tolls to the end of the term.

The damages would also include the diminution in the value of the boats and equipment used in the operation of the ferry caused by their being rendered useless for ferry service at this location.

The commissioners had no right to draw a line between the damage to the boats and to the franchise. If they intended to apply the provisions of Section 6 of the ferry act for an appraisal of boats and other property, that section was not the measure of damages and did not apply to Section 6 of the bridge act. That the provisions of the former section for such appraisal were not repeated in the bridge act shows clearly that the legislature omitted to do so intentionally because it recognized the difference between

the franchise to operate a ferry being continued in and by a succeeding ferryman and the petitioner's being left with a useless franchise or having it taken from him to be replaced by a bridge.

The ruling of the commissioners was therefore incorrect, and their determination of the damages suffered erroneous.

The remaining question is whether the Supreme Judicial Court had superintendence of the county commissioners to correct the errors above stated.

By Section 4 of the bridge act, the bridge district was given the right to take by eminent domain necessary land or real estate, and damages therefor upon petition of the owner or trustees of the district should be assessed by the county commissioners "in the same manner and under the same conditions, limitations, restrictions and rights of appeal as are by law prescribed in cases of damages for the laying out of highways." The commissioners contend that had the legislature intended to give a right of appeal to the owners of the ferry under Section 6, it would have written into the section the same provisions for appeal as in Section 4.

The legislature obviously did not intend to give the same right of appeal as in case of highways under which the damages may be determined by a committee of three disinterested persons. The legislature intended that damages to the ferry should be determined only by the county commissioners. These proceedings are not an appeal.

It is also contended that the commissioners acted only as individuals, as referees or arbitrators, and therefore their determination was final and conclusive.

But from the record they appear to have acted not as individuals but as the board of county commissioners. The petition was addressed to the "Board of County Commissioners of the County of Hancock." Notice of hearing was ordered by the "County Commissioners" to be given to the trustees of the bridge district and the state highway commission and was given by the clerk, who is the Clerk of Courts, 107 Me., 518; *Levant* v. *County Commissioners*, 67 Me., 436. Their determination of the damages suffered, and certificate of the same was signed by the three commissioners as "County Commissioners of Hancock County." The petition, order for hearing determination and certification were filed in their office.

They were not requested to act as individuals and did not assume to. They appeared to have intended to act as the board of county commissioners.

In *Machias River Company* v. *Pope*, 35 Me., 19, the charter of the plaintiff corporation authorized it to improve the Machias River for driving purposes and to charge toll proportionate to the expenditures for the improvements and required the amounts of expenditures to be audited by the "County Commissioners." The court held that the commissioners, when auditing, were acting not in their official capacity but as individuals ; in the proceedings there were no adversary parties ; and the auditing, which. was without hearing and notice, consisted only of an examination of an account, comparing it with vouchers, 'adjusting the same and stating the balance, and was in the nature of a special commission and not a judicial act.

In *State* v. *Bangor and Brewer*, 98 Me., 132, special acts of the legislature authorized the taking and purchasing of the toll bridge of a private corporation by the defendant cities, the value of the bridge to be determined by three disinterested persons, appointed by the Chief Justice of the Supreme Judicial Court, whose award should be subject to confirmation by the Chief Justice or recommitted for the correction of errors if justice required, and was conclusive as to amount ; and if the defendant cities could not agree upon the proportions in which they should pay the amount of value so determined, the proportions should, upon petition of either city and notice to the other and hearing, be determined by the county commissioners. The court held, on the authority of *Machias River Company* v. *Pope*, that the acts conferred the power on the county commissioners as persons, not on the board of commissioners as a board, that they were not to act officially, and that their determination was final and conclusive except for fraud or mistake of material facts, neither of which was claimed.

We do not think that the constructions put upon the special acts in these two cases are conclusive upon the construction of the act in the instant case.

In the former case, the duties of the county commissioners were practically clerical. In the latter, the value of the property taken for public uses and the amount to be paid therefor had already been

judicially determined as provided in the act, and the duty of the commissioners was to apportion the payment of this amount.

Whether or not the construction placed by the court upon the duties of the commissioners in the latter case would now be followed, we do not think that the legislature in the act in the instant case, after providing in Section 4 for proceedings judicial in their nature before the county commissioners acting officially as a board for determining damages for land or real estate taken by eminent domain for the purposes of a free public bridge, then proceeded to provide in Section 6 following for determining the damages suffered by the ferry owner by reason of the same public purpose by the same commissioners but acting only as persons, as referees, and not as a board; that the commissioners acted judicially in the one case but not so in the other. We think they acted in the same capacity under both sections.

The board of county commissioners is a court. *Chapman* v. *County Commissioners,* 79 Me., 269; *Nicholson* v. *R. R. Co.,* 97 Me., 43.

The Supreme Judicial Court therefore had jurisdiction under Rev. Stat., Chap. 82, Sec. 3, to correct the errors of the county commissioners in the proceedings under Section 6 of the bridge act and the petition brought here was appropriate procedure. *Levant* v. *County Commissioners,* 67 Me., 429; *Norris* v. *McKenney,* 111 Me., 33.

The case should be remanded to the court below in order that it may be further remanded to the county commissioners to determine upon further hearing and in accordance with this opinion the damages suffered by the petitioner by reason of the construction of the bridge.

*Case remanded to court below to be further remanded to county commissioners.*