## UNITED STATES v. BROOKLYN UNION GAS CO. et al.
### No. 194, Docket 20903.

Circuit Court of Appeals, Second Circuit.
May 19, 1948.

See also United States v. 25.4 Acres of Land, etc., D.C., E.D.N.Y., 65 F.Supp. 333.

Harry T. Dolan, Sp. Asst. to Atty. Gen., of Brooklyn, N. Y. (A. Devitt Vanech, Asst. Atty. Gen., and Roger P. Marquis and S. Billingsley Hill, Attys., Dept. of Justice, both of Washington, D. C., on the brief), for plaintiff-appellant.

Jackson A. Dykman, of Brooklyn, N.Y. (Cullen & Dykman, Sigourney B. Olney, and Augustus J. Wheeler, all of Brooklyn, N.Y., on the brief), for defendant-appellee Brooklyn Union Gas Co.

Cameron F. MacRae, of New York City (Beardsley & Taylor, Thomas H. Beardsley, and Earl G. Clarke, all of New York City, on the brief), for defendant-appellee Consolidated Edison Co. of New York, Inc.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

In the case of United States v. City of New York, 2 Cir., 168 F.2d 387, just decided, we have held that an award in condemnation proceedings for the taking of streets or other public facilities of a municipality should not be more than the cost of replacing them or supplying otherwise adequate facilities. Here we have the problem as applied to the facilities of public utilities companies, one supplying gas, the other electricity, to the premises taken by the United States on its expansion of the Brooklyn Navy Yard in 1941. The questions concern the same two tracts in which the City of New York has been interested, one, the Kent Avenue Addition, of 25.4 acres, more or less, involved in the case just cited, and the other, the Wallabout Market, of 53¼ acres, more or less, involved in the case of United States v. City of New York, 2 Cir., 165 F.2d 526. The issues as affecting these two companies were segregated from those affecting other defendants and then the two pro-

ceedings were consolidated by order on stipulation for trial to the court without submission to commissioners. The United States asked for the application of the same rule here with a denial of any award save perhaps a purely nominal one on the ground that no substitute facilities were required. But the effect of the district court's two opinions herein, D.C., E.D.N.Y., 65 F. Supp. 333 and 71 F.Supp. 248 (the latter after the taking of further testimony), was not only to reject the government's contention, but to grant awards at bottom measured by the worth of the physical facilities —or their economical equivalent—rendered useless by the taking.

In these two opinions Judge Byers gives a full statement of the case which we here cite by reference. We shall, however, repeat briefly some of the more salient facts. Both defendants maintained distribution facilities within the areas taken. Those of the Gas Company consisted of gas mains with joint clamps laid in the streets at a depth of about three feet, and with services or small pipes running from the mains into those buildings and structures, within the areas, to which gas was supplied for consumption. Those of the Consolidated Edison Company were also underground in the beds of the streets and consisted of conduits, ducts, manholes, and service boxes in which cables and transformers were installed. It, too, had suitable connections to the buildings and structures in the areas to which it supplied electricity for consumption. These facilities had been established and maintained under franchises duly granted to the respective companies and in full force at the dates of the takings. The original petitions in these two proceedings, each instituted in 1941, had provided for a taking of the land in question subject to existing utility easements. Subsequently they were amended so that in final form they provided for the acquisition of estates in fee simple, including all rights and easements. Although the Gas Company made no effort to remove or salvage any of its installations in the areas, the Edison Company did remove all its transformers and some cables under a stipulation with the plaintiff that this removal was not a waiver of its claim to compensation for property not removed.

In the original hearings upon the consolidated proceedings the defendants offered evidence of a value of the distribution facilities involved, based on reproduction cost, less depreciation of $24,632.92 in the case of the Gas Company and of $174,461.55 —after salvage of the transformers and cables—for the Edison Company. But the court held this not a proper method of valuation, though it did suggest that the defendants might be entitled to compensation based upon other and different theories of damages and methods of appraisal, and particularly upon some basis of loss of earnings. 65 F.Supp. 333. Accordingly an order was subsequently made permitting the re-opening of the proceedings so that the defendants might present further proof.

Upon the second hearing the defendants prevailed. This result was largely effected through the testimony of defendants' expert witness, Mr. Scharff. His method of appraisal was unique. For his basic consideration in measuring the value of a subdivision of an integrated utility system was "the estimated present worth of the reasonable fixed charges on the cost of facilities of the most economical type and of the size required to perform the service rendered by such subdivision." This he defined as the "present worth of the reasonable fixed charges."[1] Again this was "modified" (i.e., slightly reduced) "by consideration of the trend of prices and giving effect to my knowledge of the computations of the present worth of the apportionment

---

[1] Hence counsel for the plaintiff quite rationally inquired whether this was not "the approximate equivalent" of the reproduction cost, less depreciation of the equipment, but arrived at "upon the capitalization theory rather than strict reproduction cost less depreciation," to which the witness answered, "I think it might be so considered if you would accept the difference between the reproduction cost and my estimate of value as a measure of depreciation." Then he went on to concede that his computation excluded loss of income or loss of customers "from any direct application."

of contribution to return of capital and return on capital and to the present worth of loss of income." His figures therefore were $19,500 for the Gas Company and $146,000 for the Edison Company or a net of $144,749 after deducting salvage. The court adopted the expert's approach as providing a fair standard of value, save that it adjusted the valuation by using a service value based on a 20-year expectancy, rather than the 40 years employed by Mr. Scharff. Accordingly it awarded the Gas Company $15,840, and the Edison Company $108,928.55. 71 F.Supp. 248. In arriving at this result the court specifically refused to take into consideration the fact that the United States consumed more of the defendants' gas and electric current in the areas taken for the years 1942-1946 than they had sold to private consumers prior to the takings. On this appeal the plaintiff attacks the making of awards and the basis upon which they were made. It also assigns error in the ruling excluding the evidence of increased consumption.

■ There is much of logic in the contention of the United States that, since the defendants here perform public services similar to those performed by the City in the other case, the award to them should likewise be only the cost of providing the necessary facilities elsewhere in the light of the change made by the taking. But the analogy is not complete, for, unlike a municipality, the defendants do also serve their stockholders. In short they operate a business, albeit a public service one, for profit. Moreover, the law seems to be too well settled for change now that the taking of a public franchise is the taking of property for which compensation must be paid. Monongahela Nav. Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463; Los Angeles v. Los Angeles Gas & Electric Corp., 251 U.S. 32, 39, 40 S.Ct. 76, 64 L.Ed. 121; Eighth Ave. Coach Corp. v. City of New York, 286 N.Y. 84, 96, 35 N.E. 2d 907; Kennebec Water Dist. v. City of Waterville, 97 Me. 185, 54 A. 6, 60 L.R.A. 856; Waukeag Ferry Ass'n v. Arey, 128 Me. 108, 146 A. 10; Montgomery County v. Schuylkill Bridge Co., 110 Pa. 54, 20 A. 407; United States v. Puget Sound Power & Light Co., 9 Cir., 147 F.2d 953; Orgel on Valuation under Eminent Domain, 1936, ＊ § 213; 29 C.J.S., Eminent Domain § 106, pages 913, 914.

These cases in general were those of a total taking or destruction of the business of the franchise owner, a situation which appears to have caused somewhat less difficulty of analysis than where the franchise is at most impaired in value or partially taken. For, as Mr. Orgel points out, op. cit. supra, the franchise cases in eminent domain are far from clear-cut in their statement as to just what has been taken. Thus there is a tendency both to confuse the legal relations comprising the franchise with the physical properties and to leave unclear what and how many legal relations have actually been considered. We think these difficulties have entered into the trial below sufficiently to vitiate the result.

Hence while the law requiring an award for the taking of a franchise appears settled, a considerable vagueness attends the method of valuation to be applied in a situation such as is here presented. But quite instructive in both its affirmative and its negative aspects is the long litigation involving the abandonment of the Forty-Second Street spur to the New York City elevated railway system. There the railroad was losing money on the spur, but nevertheless claimed vast sums upon the City's razing of the structure as reproduction costs for the franchise and the various easements, including those of light and air originally acquired at large expense from the abutting property owners. The trial justice felt that a substantial allowance—though only a fraction of that claimed—should be made, holding that the franchise had a value based on productiveness and that present earning power and reasonable prospective value should be considered. The Appellate Division reversed, however, saying that only the original cost of the various easements should be allowed, and that the franchise had no value, since the spur could be operated only at a loss and the taking was a distinct benefit to the City. In re Elevated Railroad Structures, etc., 229 App.Div. 617, 243 N.Y.S. 665. Pursuant to this view the trial justice made a

smaller award, with no allowance for the franchise, and this was affirmed by the Court of Appeals. In re Elevated Railroad Structures, etc., 265 N.Y. 170, 182, 189, 192 N.E. 188, 190. Chief Judge Pound said: "It is difficult to see what the railroad has lost by the taking of its street franchise. It has gained relief from the burden of operating the road. What would anyone pay for the franchise apart from the right to occupy the street? Should it receive more for its franchise when the spur can be operated only at a large annual loss?" Judge Lehman, in dissenting, objected to the basis of the award, including that based on the original cost of the easements, saying that there should be no payment for rights "beyond the value which the railway company could enjoy through user or sale." Accordingly he would have granted the appeal of both the City and the railway and have returned the case for a determination of value to the company on the basis of user and sale, as a matter of business judgment.

On appeal to the Supreme Court by the railway's receiver this award was again affirmed in Roberts v. New York City, 295 U.S. 264, 283, 284, 55 S.Ct. 689, 79 L.Ed. 1429. Justice Cardozo for the Court stated that denial of an award for a franchise to operate a losing business could not be considered an infraction of the Fourteenth Amendment. The net result of this litigation is that, while a franchise must be valued as property in condemnation proceedings, its value is to be based not upon the fiction of some cost of reproduction of the physical assets which will never be made, but rather upon what as a matter of business judgment would be considered its worth, if not in sale, at least as a producer of earnings. And if it will produce none, then no award is justified. So Professor A. L. Corbin had argued at an earlier stage of the litigation in a comment, cited by Judge Cardozo, in 40 Yale L.J. 1309, 1315, where he referred to the "franchise" as "a term as greatly in need of analysis as is the term easement, for it, too, is not a physical res, but consists of legal relations between men." Here, we think, is the clue to the fallacy, urged by the defendants, and permeating the decision rendered, of identifying their loss with the curtailment of their physical facilities.

Since we have no question here of any original cost for the right to do business in the area, the case cited can fairly stand for a valuation limited, as Judge Lehman concisely suggested, to the worth on sale or as a producer of income of the right taken. And if there is no impairment of such worth then there is no basis for an award. This seems to us sound. It is axiomatic that as to property for which there is a market, the test is fair market value, City of New York v. Sage, 239 U.S. 57, 36 S.Ct. 25, 60 L.Ed. 143; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, and that compensation is measured, and limited by, the owner's loss, not the taker's gain. Boston Chamber of Commerce v. Boston, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L. Ed. 1063; Campbell v. United States, 266 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328; United States ex rel. T.V.A. v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390. So in considering a question of this type we said that, while loss of business profits as such was not allowable, yet "in default of more direct evidence of sale value" present value of "clearly to-be-expected future earnings" might be considered. Brooklyn Eastern Dist. Terminal v. City of New York, 2 Cir., 139 F.2d 1007, 1013, 152 A.L.R. 296, certiorari denied City of New York v. Brooklyn Eastern Dist. Terminal, 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579. As we there pointed out, this is not an award for business losses, such as was condemned in United States ex rel. T.V.A. v. Powelson, supra, but is a means of finding present worth in a legal interest which must be judged by its productiveness. This same view is stated with respect to a franchise to maintain a bridge in Monongahela Nav. Co. v. United States, supra, 148 U.S. 312, 328, 13 S.Ct. 622, 627, 37 L.Ed. 463, where the Court said: "The value, therefore, is not determined by the mere cost of construction, but more by what the completed struc-

ture brings in the way of earnings to its owner."

Hence while evidence of profits achieved or about to be achieved on a piece of realty is received most hesitantly, Gauley & Eastern Ry. Co. v. Conley, 84 W.Va. 489, 100 S.E. 290, 7 A.L.R. 157, with annotation 163-175; Orgel, op. cit. supra, §§ 161, 216; Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, 691, 693, certiorari denied 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583, yet the standard method of valuing a franchise is on the basis of its earnings, past as well as prospective, Waukeag Ferry Ass'n v. Arey, supra; Montgomery County v. Schuylkill Bridge Co., supra; State v. Suffield & Thompsonville Bridge Co., 82 Conn. 460, 74 A. 775; Puget Sound Power & Light Co. v. City of Puyallup, 9 Cir., 51 F.2d 688; Orgel, § 216; Lebanon & Nashville Turnpike Co. v. Creveling, 159 Tenn. 147, 17 S.W.2d 22, 65 A.L.R. 440, with annotation 455-466; cases cited infra. The reason for the distinction seems clear. For most parcels of realty some value in the market can be established, while a valuation of expected profits from its use tends to be a capitalization merely of hopes. Even here, however, such evidence has been received cautiously in default of other significant proof and under circumstances where it has distinct probative value. See cases cited at pp. 171-174 of 7 A.L.R. In the case of a franchise, however, as the cited cases show, not only is the basis of a market or sale price generally unavailable, but the factor of productiveness, i. e., of producing earnings, is the core of the legal relationship.

Even in the latter case, however, care is taken to reject speculative values. Thus the oversimplification of a capitalization of future earnings of the franchise is not resorted to, since it must be based upon too many uncertain premises, such as the continuance of the franchise and of the present return therefrom over an indefinite period in the future. National Waterworks Co. v. Kansas City, 8 Cir., 62 F. 853, 865, 866, 27 L.R.A. 827; Kennebec Water Dist. v. City of Waterville, supra; Orgel, § 216, p. 712. So opinions of experts as to future prospects have been rejected when the facts from which such ex-

perts drew their conclusions are before the tribunal. United States v. Boston, Cape Cod & New York Canal Co., 1 Cir., 271 F. 877, 886. So, too, individualized profits, based upon variable business factors, may not constitute a competent basis for computing the award. Chicago, B. & Q. R. Co. v. North Kansas City Development Co., 8 Cir., 134 F.2d 142, 154, certiorari denied North Kansas City Development Co. v. Chicago, B. & Q. R. Co., 319 U.S. 771, 63 S.Ct. 1437, 87 L.Ed. 1719. Thus here, net earnings dependent on the future trend of prices, wages, taxes, and like factors are probably a less safe guide than the trend of gross receipts. In other words, the process is not purely mechanical, but depends upon the exercise of business judgment to determine whether there has been an impairment of productiveness, and if so, by how much. Cf. In re Elevated Railroad Structures, etc., supra, 265 N.Y. 170, 192 N.E. 188.

The first opinion of the district court showed an awareness of the problem in rejecting the estimates of the reproduction cost, less depreciation, of the facilities in question, and particularly in an acute analogy it drew to the loss of earnings by a person seeking recovery for personal injuries. But in its later acceptance of the somewhat reduced estimates of the defendants' expert, accompanied as they were by an accumulation of imprecise theory in what we may say is the strong tradition of American judicial valuation, it got itself into the position of assuming a loss before one was proven and of measuring it by the extent of curtailment of the facilities. For that in last analysis was at the bottom of Mr. Scharff's tests, even though he strove for a standard based upon the best modern and economical or ideal equipment. Obviously with his yardstick the result varied according to the shortening of the gas mains or the electric distributing cables. Such a rule means of course that a utility is sure to receive a substantial award upon any shift in use of its facilities forced by governmental authority, even though such a shift may be a great advantage to it, or its previous business a losing one. Pressed to its logical conclusion, this would even mean that an award should be

made for the shutting off of outlets on the condemnation of buildings fronting on a street containing public utility facilities—a position clearly unsupportable in theory or on authority. Kellettville Gas Co. v. United States, D.C., W.D.Pa., 56 F.Supp. 919; Deepe v. United States, 103 Colo. 294, 86 P.2d 242; Fix v. City of Tacoma, 171 Wash. 196, 17 P.2d 599; In re Fort Greene Houses, Borough of Brooklyn, 177 Misc. 101, 29 N.Y.S.2d 980, affirmed 266 App.Div. 795, 41 N.Y.S.2d 859, Id., 291 N.Y. 788, 53 N.E.2d 367.

The error becomes emphasized when it is taken in connection with the court's refusal to consider evidence offered by the United States that the expansion of the Brooklyn Navy Yard had resulted in a substantial increase in business to the utilities so that actually no loss had been incurred. As the cases cited above show, evidence as to prospective earnings from the franchise is highly important. Of course gains from operation in one part of a city, due to natural growth or otherwise, should not be used to offset losses from a taking elsewhere. Thus the court in the case of the Forty-Second Street spur discussed above did not consider the losses from its operation to be offset by gains from other parts of the system. But the area affected by the very taking itself is surely to be considered as a unit, just as the court there held. Moreover, it is usual and appropriate to take into consideration the effect of the taking upon the owner's nearby property, and to allow what is, "loosely, spoken of as severance damage," as well as to set off the benefit to the remainder against the value of the land taken. United States v. Miller, supra, 317 U.S. 369, 376, 63 S.Ct. 276, 281; Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270.

The evidence offered and the claim made by the United States is summarized by the court as follows, D.C., 71 F.Supp. 248, 250:

"These claimants are not entitled to any compensation for the taking of these properties, because the land which was condemned, some 70 acres or more, was added to the Navy Yard; upon that addition new buildings were erected, and new subsurface pipes, conduits and connections were laid by the Government to effect exterior connection with the mains of the Gas 'Company near the boundaries of the enlarged Yard, and similar connections were made to sources of electric energy owned and operated by the Edison Company; more gas and electricity were consumed in the new buildings and structures during the years 1942-1946 than had been sold to private consumers under the conditions existing at the respective dates of taking (April 1, 1941, and September 19, 1941). That beneficial result, it is argued, more than compensates the claimants for any loss sustained through the takings in question, and hence no award to either is legally possible."

In declining to consider this evidence (which it had allowed to be offered for the record) the court took the positions that values as of the dates of taking were involved and that later changes in value were irrelevant. The former is of course sound; but, as we have seen, the value at the time of taking must be developed, in default of a sale price, largely from a consideration of past earnings and such showing of prospective earning power as can be made. Hence, deductions or conclusions as to future productivity not only must be made, but are an important element in a case of this kind. See Orgel, §§ 172, 216, and cases cited supra. The question then becomes one whether deductions as to the future may be checked up by the actualities as they have happened. It would seem an eerie conclusion that a court must resort to guess, closing its eyes to reality, when its decision must actually be formulated after the true facts have become available. We think the evidence admissible not as a standard of value in itself, but for its bearing upon the prospective values at the time of taking. After all, the nature of the improvement was not shrouded in mystery. There were clear grounds for expecting some development of the kind that actually happened, and evidence of such actual happening is useful to support or check the assumed prospects. The court might have carried its analogy

of loss of earnings for personal injuries this far; as is usual, the evidence of the facts to the time of trial, the evidence of prospective loss for the future, is the standard rule in such cases. See Gray v. Dieckmann, 1 Cir., 109 F.2d 382, 387, 388; Jones v. Atlantic Refining Co., D.C., E.D.Pa., 55 F.Supp. 17; Iseman v. Hayes, 242 Ky. 302, 46 S.W.2d 110, 85 A.L.R. 996; 15 Am.Jur., Damages, § 88; and cf. Shea v. Rettie, 287 Mass. 454, 192 N.E. 44, 95 A.L.R. 571, holding evidence of actual loss admissible as bearing upon prospective loss. We have admitted such evidence in private litigation, Dellefield v. Blockdel Realty Co., 2 Cir., 128 F.2d 85, 97, citing cases; and we think it appropriate in valuation cases for the purpose stated. See also United States v. Miller, supra; Montgomery County v. Schuylkill Bridge Co., supra; State v. Suffield & Thompsonville Bridge Co., supra; Reisert v. New York, 174 N.Y. 196, 208, 209, 66 N.E. 731; Harrisburg, C. & C. Turnpike Road Co. v. Cumberland County, 225 Pa. 467, 74 A. 340.

■ Although the evidence does appear of record, we think it inappropriate for us to make the ultimate conclusion upon which decision must rest. There well may be further evidence which in fairness the parties should be allowed to present, since the case went off below on a different theory of valuation. Moreover, since the conclusion must be one reached not mechanically, but through the exercise of judgment on the evidence, it should be formulated in the first instance by the trial judge, subject to the usual appellate review. He must of course bear in mind that the burden of proving the fact of loss, and, if any exists, then its amount, rests upon the condemnees. Westchester County Park Commission v. United States, supra; United States ex rel. T. V. A. v. Powelson, supra, 319 U.S. 266, 273, 274, 63 S.Ct. 1047; Welch v. T. V. A., 6 Cir., 108 F.2d 95, 101, certiorari denied 309 U.S. 688, 60 S.Ct. 889, 84 L.Ed. 1030. The award is not to exceed the amount of the loss; and if there has been none as to the franchise, then there should be no award for its asserted impairment.

The judgment is reversed and the action is remanded for further proceedings consistent with this opinion.