**UNITED STATES of America,
Plaintiff and Appellant,**

**v.**

**4,566.26 ACRES OF LAND, MORE OR
LESS, Situate IN MARICOPA COUN-
TY, STATE OF ARIZONA, John W.
Wesson, et al., Defendants and Appel-
lees.**

**No. 25218.**

United States Court of Appeals,
Ninth Circuit.

Oct. 19, 1971.

Jacques B. Gelin, (argued), Harold S. Harrison, Edmund B. Clark, Dept. of Justice, Shiro Kashiwa, Asst. Atty. Gen., Lands & Natural Resources Div., Washington, D. C., Richard K. Burke, U. S. Atty., Richard S. Allemann, Asst. U. S. Atty., Phoenix, Ariz., for appellant.

J. Gordon Cook, (argued), of McKesson, Renaud, Cook, Miller & Cordova, Phoenix, Ariz., for appellee.

Chambers, Circuit Judge, concurred and filed an opinion.

Before CHAMBERS and BARNES, Circuit Judges, and BYRNE,* District Judge.

BYRNE, District Judge:

This appeal is from judgment awarding compensation for the taking of land by condemnation. The central point in issue is the manner in which the value of the land's cotton allotment was determined.

Pursuant to Congressional action authorizing construction of the Painted Rock Dam and Reservoir, (See, Pub.L. 81–516, 64 Stat. 163), a flood control project in the Citrus Valley of the Gila River Basin in Maricopa County, Arizona, the United States, in 1959, brought a condemnation action to acquire the land of appellee Wesson. The said land contained 1285.20 acres, including 295.6 acres which had been allotted for growing cotton. The balance of the good farmland was used for growing grain and cover crops, e. g., barley, silage, Bermuda grass and Sudan grass, for the feeding of cattle. At the time of the condemnation suit there were 700 to 800 head of cattle on the property.

The formula used to calculate Wesson's condemnation awarded was the one previously approved by this court in United States v. Citrus Valley Farms, Inc., 350 F.2d 683 (9th Cir. 1965): First, the land was valued with the cotton allotment included. From this was deducted the value, if any, of Wesson's

---

* Honorable William M. Byrne, Senior United States District Judge, Central District of California, sitting by designaton.

right under 7 U.S.C. § 1378(a)[1] to transfer his cotton allotment to other land owned by him.

At the trial there was the usual spread between the testimony of the government's expert witness and that of the landowner and his witnesses with respect to the value of the land as enhanced by the cotton allotment. Appellee Wesson estimated the value of his property with the cotton allotment to be $730,968. A neighboring cotton farmer placed the value at $700,000. A real estate appraiser valued Wesson's land at $616,900. The government appraisers believed that the land with the allotment was worth, respectively, $425,000 and $440,000.

With regard to the right under Section 1378 to remove the allotment of 295.6 acres, a government appraiser expressed the view that such a right was worth $90,000 to $94,000. The real estate appraiser called by the appellee estimated the right's value to be $31,000. Wesson's cotton farming neighbor was unimpressed with the argument that the right *did* have value. In his view, the Section 1378 right was worth "very, very little money." Wesson and James Carter, a research coordinator for the Arizona Cotton Growers Association and formerly a Maricopa County Agricultural agent for the University of Arizona, agreed with this assessment, stating that the allotment was intrinsically without value.

The triers of fact sided with appellee Wesson: the jury valued the 1285.20 acres at $620,000 and the allotment right under 7 U.S.C. § 1378(a) to be $1.-00. Pursuant to the *Citrus Valley* formula, appellee Wesson was awarded a special verdict of $619,999.

In 1961 Wesson purchased 800 acres of land near the Wellton-Mohawk Irrigation Project; the following year he purchased an additional 80 acres. Wesson's decision to purchase said lands was principally due to the water supply which was comparable in price and quality to that of his condemned farm. It was on these lands that Wesson exercised his right under Section 1378 and transferred his cotton allotment.

From 1961 to 1963, Wesson leased the Wellton-Mohawk property to one Pew. During this period, Pew raised Delta Pine cotton on Wesson's land. (Wesson had raised Acala cotton on his condemned farm.) Although Pew was able to increase his yield from 1.5 bales per acre in 1961 to 2.4 bales per acre in 1963, he was still unable to show a profit as a cotton farmer. Pew's inability to make a profit was attributable to rising production costs and to dropping price supports for cotton.

At the trial, the government sought to introduce evidence showing that Wesson had purchased the Wellton-Mohawk property for $431,773 and had sold it in 1965 for $950,000. The trial court thwarted the government's effort, noting "that the period is too remote from the date of taking to determine the value of the cotton allotment at that time, and there are too many variables with re-

---

1. 7 U.S.C. § 1378(a) provides in part:

"(a) Notwithstanding any other provision of this chapter, the allotment determined for any commodity for any land from which the owner is displaced because of acquisition of the land for any purpose, other than for the continued production of allotted crops, by any Federal, State, or other agency having the right of eminent domain shall be placed in an allotment pool and shall be available only for use in providing allotments for other farms owned by the owner so displaced. Upon application to the county committee, within three years after the date of such displacement, or three years after the enactment of this section, whichever period is longer, any owner so displaced shall be entitled to have established for other farms owned by him allotments which are comparable with allotments determined for other farms in the same area which are similar except for the past acreage of the commodity, taking into consideration the land, labor, and equipment available for the production of the commodity, crop-rotation practices, and the soil and other physical factors affecting the production of the commodity: * * *"

spect to the value of the property in 1965 * * * to allow that evidence to come in to show the value of the cotton allotment that was transferred." On appeal the government maintains that the trial court's ruling deprived it "of the best and most logical evidence of the value of the § 1378(a) right. In short, the government asserts that Wesson was the recipient of a windfall because by "ignoring the actual subsequent transaction involving this allotment" it was "impossible to arrive at a realistic just compensation."

In support of its position, the government has placed primary reliance upon United States v. Brooklyn Union Gas Co., 168 F.2d 391 (2d Cir. 1948). There, the government condemned certain facilities of two public utility companies. At the hearing to determine the amount of compensation to be paid the companies, the district court refused (on the ground of "irrelevancy") to consider evidence offered by the United States that the utilities had, in fact, incurred no loss as a result of the government's taking. On appeal, the Second Circuit deemed, in effect, the trial court's refusal a misguided avoidance of reality:

"* * * the value at the time of taking must be developed, in default of a sale price, largely from a consideration of past earnings and such showing of prospective earning power as can be made. * * * It would seem an eerie conclusion that a court must resort to guess, closing its eyes to reality, when its decision must actually be formulated after the true facts have become available. We think the evidence admissible not as a standard of value in itself, but for its bearing upon the prospective values at the time of taking. After all, the nature of the improvement was not shrouded in mystery. There were clear grounds for expecting some development of the kind that actually happened, and evidence of such actual happening is useful to support or check the assumed prospects." 168 F.2d at 397.

The situation present in United States v. Brooklyn Union Gas Co., supra, is hardly analogous to the matter now in controversy. In the former case, the government's assertion that the utility companies suffered no ill economic effects from the acts of condemnation was supported by an offer of proof laden with specific factual allegations.[2] By contrast, in the instant case, the government's offer of proof was limited to showing that Wesson had sold his Wellton-Mohawk property at a considerable profit. It is noteworthy that the government did not then, nor does so now, specifically attribute this considerable profit to Wesson's cotton allotment right under 7 U.S.C. § 1378(a). The government's reluctance to credit Wesson's cotton allotment right with being the factor responsible for the sizeable profit made by Wesson is understandable given the evidence which *was* introduced at trial: it is clear from the record that cotton farming in the sixties had ceased to be

2. In United States v. Brooklyn Union Gas Co., supra, the government made the following offer of proof:

"'These claimants are not entitled to any compensation for the taking of these properties, because the land which was condemned, some 70 acres or more, was added to the Navy Yard; upon that addition new buildings were erected, and new subsurface pipes, conduits and connections were laid by the Government to effect exterior connection with the mains of the Gas Company near the boundaries of the enlarged Yard, and similar connections were made to sources of electric energy owned and operated by the Edison Company; more gas and electricity were consumed in the new buildings and structures during the years 1942–1946 than had been sold to private consumers under the conditions existing at the respective dates of taking (April 1, 1941, and September 19, 1941). That beneficial result, it is argued, more than compensates the claimants for any loss sustained through the takings in question, and hence no award to either is legally possible.'" 168 F.2d at 397, quoting from the District Court's opinion cited as United States v. 25.4 Acres of Land, 71 F.Supp. 248, 250 (E.D.N.Y.1947).

the profitable enterprise it had been in the fifties. No doubt indicative of this economic decline is the unexplained absence in the government's offer of proof of a comparison in value of cotton-land to non-cotton-land in the Wellton-Mohawk area. In short, here, unlike in United States v. Brooklyn Union Gas Co., supra, the government failed to make known to the court "the true facts (which had) become available."

■ Because of the incomplete nature of the government's offer of proof, it is clear that the trial court did not err when it rejected its introduction into evidence. California Gas Producers Association v. Federal Power Commission, 383 F.2d 645 (9th Cir. 1967); Hartford Accident & Indemnity v. Bank of Commerce, 170 F.2d 94 (5th Cir. 1948); St. Joe Paper Co. v. United States, 155 F.2d 93 (5th Cir. 1946). Indeed, the rationale employed by the trial court has been invoked by another district judge in a somewhat analogous situation. In duPont v. United States, 293 F.Supp. 1325 (D.Del.1968), plaintiffs, whose ocean front property had sustained considerable damage as a result of a storm in 1962, sought to recover income taxes paid upon disallowance of a casualty loss deduction. It was estimated that the pre and post storm values of said property was $305,000 and $210,000, respectively. In 1965 plaintiffs had contracted to sell said property for $375,000. Before this sale, plaintiffs' property and that of other landowners in the vicinity had experienced a steady increase in value. The court ruled as inadmissible the sale price of plaintiffs' 1965 agreement:

> "A number of the factors which gave rise to this increase in land values probably could not have been foreseen by a knowledgeable seller or buyer immediately after the storm in 1962.

> * * * The remoteness of the date of sale from the date of the storm, coupled with the intervening change in land values because of reasons which a knowledgeable seller and a knowledgeable buyer could not proba-

bly have foreseen, makes the 1965 sale irrelevant." 293 F.Supp. at 1328.

■ Here, the increase in value of appellant's Wellton-Mohawk property is in large part attributable to the extensive "working of the land" program instituted during Wesson's term of ownership. Although Wesson was able to transform desert land into fertile soil, his lessee was unable to overcome the ill state of cotton farming and make tilling *this* crop a successful enterprise. Nevertheless, it is clear that because of its newly developed fertility this land had considerable value to a produce farmer or cattle rancher. In short, the record adduced at trial strongly suggests that the increased value of Wesson's Wellton-Mohawk property was in no way owed to the allotment right held under Section 1378(a). Accordingly, it cannot be said that the trial court erred in not permitting the government to support the offer of proof now in controversy.

Finally, the evidence established at trial demonstrates the wisdom of the condemnation formula adopted by this court in United States v. Citrus Valley Farms, Inc., supra. The instant record sets forth the monumental task (from both agricultural and economic standpoints) of transmuting raw desert land into a *productive* cotton farm. Indeed, the difficulties encountered by Wesson and his lessee, the most notable being leaching, underscores the validity of our holding in *Citrus Valley* that the right under Section 1378(a) does not, ipso facto, augment the value of land:

> "A cotton allotment severed from the farm which has earned it no longer represents proven productive merit and the ability to produce profitably. When attached to new land it does not automatically enhance that land to the extent of the value of the cotton-land characteristics of the land from which it was severed. Attached to new land it represents only its license-to-produce aspect. It proves nothing as to the productive ability of the land, for the new land did not create the history

upon which the allotment was founded." 350 F.2d at 686.

Affirmed.

CHAMBERS, Circuit Judge (concurring):

To me, the evidence about the cost and sale of Wesson's new land was properly excluded. There were too many factors in it other than the one element of the transferred cotton allotment to use its history as an indication of the value of the cotton allotment.

I have an abiding belief that the deduction of one dollar as the value of the cotton allotment is not enough. I wish the jury had taken off a few thousand dollars for it. But as I see it that question is not really before us.

So I concur.